UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN RICHARD BEACH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:08-cv-00569 **(Consolidated)** |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | Judge Todd J. Campbell Magistrate Judge Juliet Griffin |
| HEALTHWAYS INC., THOMAS G. CIGARRAN, BEN R. LEEDLE, JR., MARY A. CHAPUT, DONALD TAYLOR, MARY HUNTER, and MATTHEW KELLIHER, | ) ) ) ) ) | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of purchasers of the common stock of Healthways, Inc. ("Healthways" or the "Company") between July 5, 2007 and August 25, 2008 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Healthways provides disease management and wellness programs for Medicare, health plans, hospitals and small businesses, helping members with diabetes, cancer and other diseases to coordinate care, keep up with treatment and maintain healthy behaviors.  The defendants are the Company and its senior executives including the Chairman of the Board Thomas G. Cigarran, the CEO Ben R. Leedle, Jr., the CFO Mary A. Chaput, and three executive Vice Presidents, Mary Hunter, Matthew Kelliher and Donald Taylor.

2.      Three years ago, the Centers for Medicare & Medicaid Services ("CMS") launched Phase I of the Medicare Health Support pilot program ("MHS").  Healthways, along with several other disease management providers, became participants in Phase I of the MHS pilot and began providing disease management services to Medicare recipients participating in the pilot program.  At the outset of the pilot program, CMS established a 5% savings target as a criteria for evaluating the success of Phase I of the pilot program.  Under the terms of the contract between Healthways and CMS, failure to meet the 5% savings target would obligate Healthways to reimburse CMS for millions of dollars in fees that CMS paid to Healthways over the course of the pilot program and would also make Healthways' participation in a Phase II of the program unlikely.

3.      During the Class Period, defendants repeatedly made positive public statements regarding Healthways' participation in the MHS Phase I pilot.  These included statements regarding Healthways' pending request that CMS reduce the savings target from 5% cost savings to a break-even target.  On January 7, 2008, when CMS ultimately announced that it would be adopting the revised break-even savings target proposed by Healthways, defendants issued a press release and

filed a Form 8-K with the Securities and Exchange Commission ("SEC") disclosing CMS's reduction of the program savings target as a *material* event for the Company. Defendants, however, concealed from investors that the Company was unable to meet even the break-even savings target. Defendants' concealment of the fact that Healthways was unable to meet even the break-even savings target misled investors and caused Healthways shares to trade at artificially inflated levels, reaching a record high in response to Healthways Form 8-K announcing that CMS approved a reduction in the MHS savings target from "5% net savings to budget neutrality." Following this release, Healthways' shares reached a record high of $67.21, increasing $8.74 or approximately 15%.

4.      Defendants' concealment of Healthways' inability to meet even downwardly revised savings targets rendered the Company's statements regarding the potential and ultimate downward revision of savings targets misleading. Put simply, if Healthways was unable to meet even downwardly revised savings targets, the likelihood of their adoption by CMS would not make participation in Phase II of the pilot program any more likely for the Company. Three weeks after Healthways announced that CMS had reduced the savings targets to break-even, CMS disclosed what Healthways had long concealed from the public – that the providers participating in Phase I of the pilot program (including Healthways) were unable to meet even the break-even savings target. On this news, Healthways' stock plummeted by $10.52 per share or 16%, because as a result of the Company's inability to achieve even the break-even savings target, Healthways would likely be required to reimburse CMS for millions of dollars in fees that the Company had already received from CMS through the program, and would be unlikely to be awarded participation in any Phase II of the pilot program.

5.      Defendants and other Healthways executives were aware from at least the start of the Class Period that even the revised savings targets were unobtainable and collectively sold 519,574

shares of Healthways stock for proceeds of $28.2 million, all at inflated prices. The extraordinary magnitude and fortuitous timing of the individual defendants' insider selling during the Class Period is illustrated by the chart below:



6. In addition to the problems that Healthways was experiencing with the MHS pilot during the Class Period, Healthways' core business was also losing contracts and suffering from downward adjustments to billing rates. These problems came to a head prior to the start of the Class Period when large customers questioned the savings data communicated by Healthways to them. As a result, customers including Blue Cross of Minnesota, Blue Cross of Massachusetts, and Wellmark began canceling and/or renegotiating contracts to include additional services for the same or less money and/or rebates of fees already paid. Defendants concealed these material facts and failed to make required disclosures in Healthways' Management's Discussion and Analysis ("MD&A")

Section of its fiscal 2007 Form 10-K, its 3Q07 Form 10-Q, and its 1Q08 Form 10-Q as required by SEC Staff Accounting Bulletin No. 99 ("SAB 99") *Materiality* and Statement of Position 94-6 ("SOP 94-6"), Disclosure of Certain Significant Risks and Uncertainties. Furthermore, defendants Cigarran, Taylor, Hunter and Kelliher, who traded Healthways shares during the Class Period, had a duty to disclose these material facts before selling their shares or abstain from trading.

7. Furthermore, because of the significant canceled contracts, the renegotiated billing rates and rebates required to retain existing customers, and because of the drastic (approximately $40 million) reduction in revenue to be obtained from WellPoint, Inc. ("WellPoint") in fiscal 2008, defendants were aware that the earnings guidance that they communicated to investors during the Class Period, for fiscal 2008, was unachievable.

8. When the truth relating to lost and/or problematic contracts began to be disclosed to the public on February 12, 2008, Healthways share price fell by $4.95. On February 26, 2008, when the Company corrected its misstated financial guidance for fiscal 2008, the stock price plummeted by an additional $13.42, losing nearly 30% of its value. On August 25, 2008, when the Company communicated a further sequential decline in revenue due to the impact of certain contract renegotiations and reduced revenues associated with the winding down of a previously discussed contract termination, the stock price dropped by $5.54 or approximately 22%.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

12.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.     Lead Plaintiff West Palm Beach Firefighters' Pension Fund, as set forth in the certification previously filed with the Court and incorporated by reference herein, purchased the common stock of Healthways at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Plaintiff John Richard Beach, as set forth in the certification previously filed with the Court and incorporated by reference herein, purchased the common stock of Healthways at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant Healthways provides specialized health and care support solutions in the United States.

16.     Defendant Thomas G. Cigarran ("Cigarran") is, and was at all relevant times, Chairman of the Board of Directors of Healthways.   Cigarran co-founded Healthways in 1991, served as the Company's CEO from August 1988 until September 2003, and served as the President of Healthways from September 1981 until June 2001.   During the Class Period, prior to the disclosure of the material facts defendants concealed from investors, Cigarran sold 75,000 shares of Healthways stock at inflated prices for proceeds of over $4.3 million.   Cigarran's Class Period sales were out of line with his past trading practices as he had not sold any Healthways' shares for nearly two years prior to his Class Period sales.

17.     Defendant Ben R. Leedle Jr. ("Leedle") is, and was at all relevant times, Chief Executive Officer and President of Healthways.  Prior to becoming the CEO and President of Healthways, Leedle served as the Executive Vice President of the Company from September 1999 until May 2002 and served as Senior Vice President of Operations from September 1997 until September 1999.  Leedle has also served on Healthways' Board of Directors since September 2003.

18.     Defendant Mary A. Chaput ("Chaput") is, and was at all relevant times, Chief Financial Officer and Executive Vice President of Healthways.  She has served the Company in that capacity since October 2001.

19.     Defendant Donald Taylor ("Taylor") was, during the Class Period, the Executive Vice President-Sales of Healthways until he announced his resignation from the Company in November 2007 (resignation effective December 31, 2007).  Taylor joined Healthways in 2002 as Executive Vice President-Business Development.  During the Class Period, prior to the disclosure of the material facts defendants concealed from investors, Taylor sold 227,500 shares of Healthways stock at inflated prices for proceeds of over $10.9 million.  *Taylor's Class Period sales of 99% of his Healthways' holdings were out of line with his past trading practices as he had not sold any Healthways' shares for the nearly five years he worked at Healthways prior to his Class Period sales*.

20.     Defendant Mary Hunter ("Hunter") is, and was at all relevant times, Executive Vice President and Chief Operating Officer-Hospital Group of Healthways.  Hunter has served the Company in that capacity since 2001.  Prior to becoming Executive Vice President and Chief Operating Officer-Hospital Group, Hunter served as a Senior Vice President from 1994 until 2001. During the Class Period, prior to the disclosure of the material facts defendants concealed from investors, Hunter sold 50,000 shares of Healthways stock (93% of her holdings) at inflated prices for proceeds of $3.1 million.

21.     Defendant Matthew Kelliher ("Kelliher") is, and was at all relevant times, Executive Vice President-International Business of Healthways.  Kelliher has served the Company in that capacity since September 2004.  Kelliher has served the Company as an Executive Vice President since 2003.  During the Class Period, prior to the disclosure of the material facts defendants concealed from investors, Kelliher sold 40,000 shares of Healthways stock at inflated prices for proceeds of over $2.3 million.  ***Kelliher's Class Period sales of 99% of his Healthways' holdings were out of line with his past trading practices as he had not sold any Healthways' shares for the nearly four years he worked at Healthways prior to his Class Period sales***.

22.     Defendants Cigarran, Leedle, Chaput, Taylor, Hunter and Kelliher are collectively referred to herein as the "Individual Defendants."

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Healthways, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Healthways, as discussed in detail below.  Because of their respective positions with Healthways, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive

officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Healthways' business.

25.     The Individual Defendants, because of their positions with Healthways, controlled and/or possessed the authority to control the contents of the Company's reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.     As senior executive officers and/or directors, and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on The NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Healthways' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, as well as to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Healthways' common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of Healthways common stock, by disseminating materially false and misleading statements and/or concealing material adverse

facts. The scheme: (i) deceived the investing public regarding Healthways' business, operations, management and the intrinsic value of Healthways' securities; (ii) allowed Defendant Cigarran and other Company insiders to collectively sell 519,574 shares of their personally-held Healthways common stock for gross proceeds in excess of $28.2 million; and (iii) caused Plaintiffs and members of the Class to purchase Healthways common stock at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Healthways between July 5, 2007 and August 25, 2008, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Healthways common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Healthways or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

31. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in securities class action litigation.

32. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the business and operations of Healthways;

(c) whether the price of Healthways common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

33. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

34. Defendant Healthways describes itself as the "leading provider of specialized, comprehensive Health and Care Support(SM) solutions to help millions of people maintain or improve their health and, as a result, reduce overall healthcare costs. Healthways' solutions are designed to help healthy individuals stay healthy, mitigate and slow the progression of disease

associated with family or lifestyle risk factors and promote the best possible health for those already affected by disease."

35. Healthways provides disease management and wellness programs for health plans, hospitals and small businesses, helping members with diabetes, cancer and other diseases to coordinate care, keep up with treatment and maintain healthy behaviors.

**Healthways was unable to meet even modified CMS Savings Targets**

36. Three years ago, CMS launched Phase I of the MHS Pilot with the twin goals of improving the quality of care received by Medicare and Medicaid beneficiaries who had multiple chronic conditions, and helping the Medicare and Medicaid programs to achieve cost savings. During Phase I of the pilot program, which was scheduled to last for three years, CMS evaluated the care the participants received, their satisfaction with the care received, and the cost savings achieved through the pilot program. Once Phase I of the pilot program ended, CMS would decide whether to expand the pilot program to a second phase.

37. At the beginning of the pilot program, Healthways established a MHS call center in Maryland, which it staffed with nurses, social workers and dietician(s). After the call center was staffed and running, call center personnel contacted Medicare beneficiaries and enlisted them to participate in the MHS pilot program. During the Class Period, the MHS call center provided disease management services to approximately 16,000 Medicare beneficiaries with diabetes and/or heart conditions. MHS personnel advised the participating beneficiaries regarding their day-to-day healthcare needs, ensured that they were following the care plans outlined for them by their individual doctors, and made sure that they understood their prescriptions (including possible food interactions, etc.) and the standard of care for their conditions (*e.g.*, for beneficiaries with diabetes, call center personnel made sure that the beneficiaries understood that they needed to have their blood pressure checked and a blood panel taken at every doctor's visit). The overall goal of the program

was to keep these individuals healthier, resulting in fewer hospital visits, which would, in turn, save Medicare money.

38.     The savings targets initially proscribed by CMS, which Healthways was responsible for delivering, were to save 5% per month per pilot program beneficiary as compared to a control group of 10,000 Medicare beneficiaries who lived in the same geographical region as the pilot program beneficiaries, but who were not receiving any disease management services. Throughout the Class Period, Healthways failed to deliver the 5% cost savings sought by CMS. As Healthways became ever more distant from the savings targets as the pilot progressed, the Company shifted its focus away from meeting the cost savings targets to convincing CMS to change the rules by segmenting the MHS pilot populations into low, medium and high risk beneficiaries and setting specific cost savings targets for each group. In January 2008, as the Phase I pilot program was nearing its end, CMS agreed to lower the savings target from 5% to "break-even" or "budget neutrality." However, defendants knew from at least the beginning of the Class Period that Healthways was unable to meet even this drastically reduced savings target.

39.     Throughout the pilot program, Michael Montijo, a Senior Vice President at Healthways and Healthway's MHS Medical Director, frequently traveled from the Company's corporate headquarters in Franklin, Tennessee to Healthway's MHS call center in Maryland. During these frequent visits, Montijo informed the call center personnel that the call center was failing to meet the cost savings targets set by CMS. While Montijo was initially supportive of the call center personnel during his visits to the call center, encouraging them to keep working hard, he began to blame the call center personnel for the call center's failure to meet CMS' cost savings targets. Montijo went so far as to criticize the nurses for encouraging beneficiaries to go to the hospital too frequently, which increased costs, thereby hindering the call center in its attempt to achieve the cost savings target.

40.     As detailed below, from the beginning of the Class Period, defendants were aware that Healthways was not meeting – and would not be able to meet – either the 5% cost savings target initially set by CMS or the modified break-even savings targets adopted by CMS later in the Class Period.  Defendants also knew that, as a result of the Company's failure to achieve these savings targets, Healthways could be required to reimburse CMS for millions in fees that the Company had already received from CMS through the program.  Defendants further knew that the Company's participation in Phase II of the pilot program was extremely unlikely given that the second phase would only proceed if Phase I was deemed to be successful.

41.     However, defendants concealed from investors the fact that the Company was far from meeting the 5% savings targets.  Nor did defendants reveal to investors that even if CMS agreed to reduce the cost savings target to break-even as Healthways had requested, which CMS ultimately agreed to do in January 2008, the Company could not meet even this drastically reduced cost saving target.  Defendants were aware that they were failing to meet either the 5% cost savings target or the modified break-even savings target because, throughout the Class Period, Healthways received quarterly arc reports from CMS clearly showing that the Company was falling short of the cost savings target.  Because the arc reports clearly showed that Healthways would not be able to meet the cost savings targets set by CMS, defendants knew that Healthways would be required to reimburse CMS for fees that it had already paid to the Company and would likely not be eligible to participate in the second phase of the MHS program, if Phase II were even to go forward.  According to the Form 10-Q filed July 10, 2008, Healthways had $60.8 million of "performance-based fees subject to refund" related to the MHS pilots recorded in the "contract billings in excess of earned revenue" account on its balance sheet as of May 31, 2008.

42.     The quarterly arc reports that Healthways received from CMS containing the savings figures for the MHS program revealed that, throughout the three-year period, Healthways was not

achieving the savings targets set by CMS. ***Defendant/CEO Ben Leedle, defendant/CFO Mary Chaput, EVP Bob Stone, SVP Michael Montijo and Controller Alfred Lumsdaine were all involved in discussions concerning the cost saving figures contained in the arc reports and were involved in tracking the project closely***.

43. CMS forecasts and financial analysis was handled by a team assigned to CMS. Michael Montijo was responsible for Healthways being awarded the pilot by CMS and Montijo became the head of the team working on the project. ***EVP Stone worked closely with Montijo and Leedle, Chaput and Lumsdaine were all involved in communicating with CMS about the program and received financial updates about the program, including the arc reports (described below)***.

44. Healthways received arc reports from CMS on a quarterly basis with the actual savings figures for the pilot program. These reports were then analyzed by the finance team assigned to CMS, which consisted of Senior Director of Finance Michael Gonzalez, Michael Black and John Turner.

45. Problems with the MHS pilot were also discussed at monthly round table meetings which were attended by senior management.

46. Starting in 2006, Healthways pilot program began to drift further and further from the 5% savings target set by CMS and even a modified break-even target. The 5% net savings target meant that CMS wanted to save 5% of the costs associated with the subjects participating in the program (including the fees paid to Healthways). Healthways needed to achieve 5% cumulative savings by the end of the third year and as a result the savings target started at lower than 5% and increased over time. The participating beneficiaries were compared to a control group.

47. Starting in 2006, once accurate figures based upon actual processed claims on the individuals were paid by Medicare, the reports were negative on the savings target. The arc reports provided this information to the individual defendants on a quarterly basis. Defendants

independently made assessments using these reports which showed that the savings targets would not be met. As the Company continued to receive the quarterly arc reports indicating that the savings targets were not being achieved, the defendants were trying to figure out what was wrong and how to correct the problems and achieve the savings targets. Specifically, the MHS team analyzed the numbers and provided "what if" scenarios in the event the program changed to Montijo, Leedle, Stone, Chaput and Lumsdaine. The finance department was a "close knit" group and the MHS program was a topic of interest.

48. Prior to the start of the Class Period, when defendants became aware that the Company would not be able to meet savings targets, defendants instead, focused on convincing CMS to change the rules or the parameters of the program. Specifically, defendants approached CMS about segmenting the population participating in the pilot into low, medium and high risk and then assigning different savings targets to each population.

49. The poor results of the MHS pilot resulted in lower revenues for the end of fiscal 2007. Despite being aware of the problems with MHS, in the conference calls discussing quarter end and fiscal year-end results, defendants falsely described the success of the MHS program with nuances by referring to the success of the program in certain segments of the population without disclosing the Company's overall inability to achieve savings targets.

50. The Company's inability to meet even the requested break-even savings target was further exacerbated by the start of the Class Period, as people participating in the pilot died. As a result there were fewer people, which meant it was more difficult for the Company to achieve the average savings targets needed. CMS even provided a "refresh population" (more beneficiaries), but it was still not possible for Healthways to achieve the required savings targets.

51. Eventually, CMS agreed to change the savings targets from 5% net to break-even. However, Healthways was too far behind the savings targets to even break-even.

52.     Healthways was one of approximately ten companies that received a contract from Medicare to participate in the MHS pilot program.  CIGNA was another company participating; CIGNA used Healthways to staff and resource its pilot program.  Essentially, CIGNA administered or held the contract and Healthways provided the personnel.  The CIGNA group ran the program in Columbia, MD, but dealt with Medicare beneficiaries in Georgia.  Due to CIGNA's failure to achieve the savings targets, CIGNA decided to terminate its participation in the pilot program prior to the program's completion.

53.     As of the start of the Class Period, Healthways' management, including the defendants, were aware, as a result of their analysis of savings trends, that the pilot would not end successfully.  Thus, defendants were aware, but failed to disclose, that the MHS pilot would be unsuccessful.   In addition, the pilot continued to underperform during the Class Period and defendants made a decision to cease reporting MHS income/costs per diluted share separately in certain of the Company's publicly communicated financial statements.  This decision was made in order to conceal the Company's inability to meet savings targets associated with MHS, and, starting with the Form 8-K filed with the SEC on December 19, 2007, the Company stopped detailing net income/costs derived from MHS.  Instead, the Company combined this category with other domestic business.  Prior to the Class Period, Healthways reported its income per share by segments: domestic, MHS and international.  Defendants decided to combine MHS costs per share with domestic income per share in order to hide the poor CMS figures, the Company's high costs and the inability to meet even the break-even savings targets.  Such a change in reporting made it difficult, if not impossible, for investors to assess the performance of the MHS pilots compared to prior years. Generally Accepted Accounting Principles state that a qualitative characteristic of useful accounting information must be comparable and consistent.  *See* Statement of Financial Accounting Concepts

("SFAC") No. 2, *Qualitative Characteristics of Accounting Information*.[1] Additionally, early in the pilot, Healthways also improperly recognized revenue received from CMS. The Company later reversed recognition of some of those revenues because the pilot would not be successful.

54.     MHS income, although relatively small, was material to investors because of the importance of the project to the Company's future growth and because the stock price reflected the relative success or failure of the pilot. Chaput and Lumsdaine were closely involved in this decision to reverse revenue recognition, as well as in how this change would be publicly portrayed.

55.     MHS revenue was calculated by the MHS finance team mentioned above by multiplying the number of lives by a rate they established and then taking into consideration the savings rate to determine if revenue was achieved. With the core revenues, the operations group forecast the run-rate or existing business, the sales group forecast new business, and international revenue was also calculated separately.

56.     The Company forecasts were compiled monthly and discussed by the defendants in Business Outlook Meetings, which included discussions of MHS. These meetings typically lasted one and a half hours, with one hour devoted to discussing sales forecasts. There was a large group of attendees, including all of the department heads, the financial support for each department, Leedle, Chaput and Lumsdaine. During the Class Period, however, the attendance of these meetings were limited by the defendants to only about 10 people. Of course, this smaller group of people still included Chaput, Leedle, Lumsdaine, SVP of Finance Chip Wochomurka, and COO Jim Pope. The negative forecasts for MHS that were discussed at these meetings were compiled into an Excel

---

[1]     "Information about an enterprise gains greatly in usefulness if it can be compared . . . with similar information about the same enterprise for some other period or some other point in time. The significance of information, especially quantitative information, depends to a great extent on the user's ability to relate it to some benchmark." *See* SFAC 2, ¶111. "If valid comparisons are to be made over time, the unit of measurement used must be invariant." *See id*. at ¶114. "Certainly, comparability cannot be achieved without consistency of inputs and classification." *See id*. at ¶117.

spreadsheet, which was made into a PowerPoint presentation for the Business Outlook meetings. This specifically included the CMS MHS forecasts, which were included in the forecast package and discussed at the monthly Business Outlook meetings.

57.     Lumsdaine warned one finance executive that he should not put uncertainties in emails due to the potential for litigation.

### Contract Cancellations and Downward Adjustments to Billing Rates Were Improperly Omitted from Three Class Period SEC Filings and Rendered the Guidance Communicated to Investors During the Class Period Unachievable

58.     Prior to the start of the Class Period, Healthways was experiencing systemic problems with its business, as major customers began to question the savings data communicated by Healthways to them.  As a result, customers began canceling contracts and/or demanding additional services for less money and/or rebates of fees already paid.  Healthways failed to disclose these material facts in the MD&A Section of its fiscal 2007 Form 10-K, its 3Q07 Form 10-Q, and its 1Q08 Form 10-Q as required by SAB 99 and SOP 94-6.

59.     According to SAB 99, "[t]he omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."  The canceled contracts and renegotiated billing rates described herein were clearly material under SAB 99 and therefore required disclosure.

60.     SOP 94-6, issued in December of 1994, also requires disclosures arising from risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term.  In particular, it calls for financial statement disclosure in certain circumstances, if the volume of business transacted with particular customers could be severely impacted in the near term. *See* ¶¶08, 21 and 22.  SOP 94-6 required the disclosure of contract cancelations and the renegotiated

billing rates of large customers, including Blue Cross of Massachusetts and Blue Cross of Minnesota, as described below.

61.     The overall objective in the MD&A section of SEC filings is to provide investors with the information needed to assess the financial condition and results of operations of the registrant. Further, the disclosures are designed, without limitation, to allow investors to view the business through the eyes of management.[2] The MD&A is to focus specifically on material events known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. If the registrant knows of events that will cause a material change in revenues, the change in the relationship must be disclosed. Furthermore, a defendant who trades a company's shares while in possession of material non-public information has a duty to disclose such information or abstain from trading.

62.     Moreover, as a result of the developments described below, defendants became aware that the earnings guidance that they communicated to investors during the Class Period could not be achieved. Additionally, in the Company's publicly communicated fiscal 2008 guidance, defendants included revenue for contracts that they knew the Company was unlikely to obtain.

63.     Instead of communicating to investors a fair estimate of revenue and income that the Company expected to earn in the future, defendants communicated earnings guidance to investors that had been created from the top down for the purpose of meeting analyst expectations. Defendants' dissemination of this guidance was false and misleading, as defendants were aware that the Company could not meet the earnings guidance for fiscal 2008 that it communicated to investors during the Class Period.

_____

[2]     *See* SEC Release 33-6834, SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, of May 18, 1989.

64.     Defendants became aware, at least by the start of the Class Period, that major customers, including Blue Cross of Minnesota, Blue Cross of Massachusetts and Wellmark, were canceling programs and/or requiring Healthways to provide more services for the same or less money on other programs, rendering these major contracts far less profitable. The negative impact of the reduction of profits from these contracts to fiscal 2008 alone was in the tens of millions of dollars, and, as a result, the fiscal 2008 guidance communicated to investors during the Class Period was materially false and misleading.

### Blue Cross of Massachusetts

65.     Because of quality and pricing problems, the Company learned in mid 2007 that Blue Cross of Massachusetts was scaling back and eliminating some of its programs with Healthways, including the provider services segment of the contract. This segment was eliminated in an effort to decrease costs and because Healthways was unable to deliver the higher levels of quality service required by the customer.

66.     Blue Cross of Massachusetts was a large contract for the Company and the Raleigh Business Unit was formed to support this contract, which was growing approximately 50% each year before 2006. As of 2006, this account represented approximately $50 million a year in revenues for the Company and grew to approximately $70 million by 2007. Prior to the start of the Class Period, Blue Cross of Massachusetts communicated that it did not trust the data provided by Healthways and that it was unhappy with the quality of the services provided by Healthways. Specifically, Blue Cross of Massachusetts was having difficulty reconciling invoices received from Healthways' Raleigh Business Unit every month.

67.     Profit margins for Blue Cross of Massachusetts were approximately 50% to 60% as of 2006. However, as of 2007, Blue Cross of Massachusetts communicated to Healthways that it wanted to reduce costs by 50%, but still wanted to receive the same amount of services from

Healthways. Blue Cross of Massachusetts had to reduce these costs due to internal pressures and renegotiated its contract with Healthways as a result. As a result of this renegotiation, which occurred in the second half of 2007, between $20 and $50 million in revenues were lost for the next fiscal year.

68. Furthermore, in order to maintain the same amount of services on the remaining portion of the contract, profit margins decreased to as low as 15% from their original 50-60% level. Provider Service Managers ("PSMs" or nurses that traveled to visit physicians) were eliminated from the Blue Cross of Massachusetts contract by approximately January 2008. PSMs represented a significant cost to the contract due to the amount of traveling of these individuals. These individuals received a generous severance from the Company. As a result of the changes to the Blue Cross of Massachusetts contract, nurses in the call center supporting this contract had decreased from 250 nurses to 100 nurses.

69. Defendants were aware of the above material facts during the Class Period, but failed to timely disclose them to investors. The failure to disclose these material facts in the MD&A Section of the Company's fiscal 2007 Form 10-K, its 3Q07 Form 10-Q and its 1Q08 Form 10-Q violated SAB 99, SOP 94-6 and the duty to disclose or abstain from trading.

## Blue Cross of Minnesota

70. Similarly, defendants learned prior to the start of the Class Period that Blue Cross and Blue Shield of Minnesota, which accounted for approximately $50 million or 6% of revenue per year, would not renew significant portions of its contract with Healthways. As early as 2005, Healthways learned that 11 programs had been designated by Blue Cross of Minnesota as Impact Condition Programs or programs that Blue Cross of Minnesota was concerned were not providing/generating an adequate return on its investment. These programs that were not performing, and therefore, were in danger of being eliminated included Lower Back, Arterial Fib,

Hepatitis C, Decubitus Ulcer, Urinary Incontinence, Acid Reflux, Irritable Bowel, Osteoporosis and Osteoarthritis.

71.     Prior to the start of the Class Period, Blue Cross of Minnesota advised Healthways that it would be scaling back and eliminating some of its programs with Healthways. As a result of these cutbacks, numerous positions were eliminated and employees were laid off or reassigned. Defendants failed to timely disclose this material information. Defendants failure to include this information in the MD&A Section of its fiscal 2007 Form 10-K, its 3Q07 Form 10-Q, and its 1Q08 Form 10-Q violated SAB 99, SOP 94-6 and the duty to disclose or abstain from trading.

72.     Further, defendants knew, as a result of the above, that the forecasts they communicated to investors for fiscal 2008 during the Class Period were not obtainable.

## Healthways Failed to Meet Contractual Requirements for Wellmark, Inc. and Other Customers

73.     Healthways repeatedly failed to meet contractual requirements, which resulted in contract cancellations or renegotiations. Wellmark, Inc. ("Wellmark") was comprised of a number of different insurance carriers. Wellmark oversaw multiple contracts that covered several different geographical locations and entities. Essentially, Wellmark served as an umbrella for individual contracts. Wellmark gave notice to Healthways that it intended to cancel certain of its contracts with Healthways sometime around the end of December 2006 or early January 2007. However, based upon the terms of the contracts with Healthways, Wellmark could not terminate these contracts until the end of the contract periods, which were staggered throughout 2007. Portions of these contracts were renegotiated with terms far less favorable to Healthways prior to the start of the Class Period. Further, portions of the Blue Cross Blue Shield of New Mexico contract were canceled in late 2006, likely around October or November of 2006. Portions of the Blue Cross Blue Shield of Illinois contract were canceled in January 2007.

74.     Assistant Health Care Analysts were responsible for producing reports for these insurance companies with whom Healthways had contracts, including Wellmark. These reports provided information (including an analysis of member data) to the providers concerning whether Healthways was meeting its clinical and financial requirements as dictated in the contracts between the providers and Healthways. Provider reports for Wellmark and other customers revealed that Healthways was not meeting its contractual targets and was thus likely to lose the contracts.

75.     The template for the Analysis of Member Data reports was presented to the provider in a *Word* document. The supporting data for the Word document (taken from Healthways medical claims computer program) was kept in an *Excel* spreadsheet. The reports were sent to the provider, but the reports and the Excel spreadsheet were both saved on the computer system by Healthways for "tracking purposes."

76.     The reports covered the clinical requirement of the contract, including whether Healthways was meeting the Healthcare Effectiveness Data and Information Set ("HEDIS")[3] standards and the financial requirements.

77.     Clinical requirements of the Analysis of Member Data reports related to the medical information of the patients. The clinical requirements include the HEDIS standards, whether the patient has been provided or obtained specific tests, exams, or medications for their related health conditions. These tests, exams or medicines included tests for diabetics, including the A1c test, DRE (Dilated Retinal Eye Exam), and foot exams, as well as beta blockers, Ace inhibitors, and whether asthmatics were taking the correct medications. Healthways was having difficulty meeting these requirements.

---

[3]     HEDIS is a tool used by more than 90% of America's health plans to measure performance on important dimensions of care and service. *See* http://www.ncqa.org/tabid/59/Default.aspx.

78.     As dictated by terms within its contracts with providers, Healthways also had to meet certain financial requirements.  Healthways was responsible for showing that the provider was receiving a ***return on investment ("ROI")*** by contracting with Healthways.  The contract terms also dictated how much revenue Healthways derived under these contracts depending upon the ROI received by the provider.

79.     Healthways used information from the provider's base period to determine how much money the provider spent during a specified time period (time periods were dictated by the contracts).  The base period is a predetermined time period (usually two years) of the patient treatment data from the previous disease management company.  Either all or only portions of the base period data can be used to compare Healthways' results with that of the previous disease management company.  As an example, assume during the last six months of a two‑year base period the provider paid an average of $10 per member to the prior disease management company.  Then during the first six months of Healthways contract, the provider paid an average of $8 per member.  Healthways would then take the $10 and add a "completion factor."  The completion factor was the "cost of inflation."  Based upon the cost of inflation, Healthways might say that the $10 from however long ago would have been equal to $11 per member if paid today.  This meant that Healthways actually saved the provider a total of $3 per member (the difference between the inflated $11 and the $8).  Healthways then received one of the three saved dollars as compensation for its work and the provider "kept" the other $2 in savings.  Numerous ROIs were not met by Healthways.

80.     Once finalized, the Analysis of Member Data reports were presented by one or more members of "senior management" to the provider.  Analysis of Member Data reports were usually compiled using the same format, although the time frames might change.  The report included patient data for a certain time-frame (the time-frame was usually three months, six months, nine months or 12 months) along with a three month "run-out" time.  For example a report might be a

"three-on-three" report. This meant that data related to the patients care (clinical and financial data) was compiled for a three month time period, for example January through March. Claims could be submitted (depending on the plan) up to 90 or 120 days after the date of treatment. As a result, Healthways would wait an additional three months (the run-out time) after March to make sure that all patient bills were submitted and that this information was included in the final report.

81.     The defendants were provided reports and updates as to how these contracts were performing. Directors of Finance prepared monthly reports for the provider contracts they oversaw. The directors then presented these financial reports to "upper management," including, defendant and CFO **Mary Chaput**.

82.     An Excel spreadsheet that the senior finance staff could access contained information relating to Healthways contract requirements and revenues. This spreadsheet tracked important financial information for all of Healthways contracts (both current and prospective). Finance Directors used this spreadsheet for presentations made to "upper management." The spreadsheet was originally e-mailed to upper management, but presentations were also created by Finance Directors for face-to-face meetings, which were held monthly at the very end or the very beginning of a given month.

83.     Healthways was not meeting its contractual financial obligations on many of its contracts including those referenced above. As a result, senior managers continually wanted to look at the numbers in the Analysis of Member Data reports in other ways. The Analysis of Member Data reports were created by pulling the information from Healthways computer systems. Much of the data was taken from **Popworks** which contained the medical records for the member patients. Senior managers would on occasion order that these reports be revised to apply certain "completion or trend ratios" to the data in an attempt to make it look more favorable for Healthways.

84.     In early 2007, Healhtways was having a "difficult time completing" the provider reports for Wellmark. Finance managers were continually looking at the reports and applying trends to the reports to see if there was any way to make the data appear more favorable to Healthways.

85.     Providers, including Wellmark, were repeatedly questioning the ROI. The providers wanted to know how Healthways determined the savings and specifically how inflation was determined. Ultimately, based upon these concerns, Wellmark gave notice that it was canceling contracts with Healthways. As a result, defendants were required to renegotiate portions of these contracts to provide additional services for essentially the same revenues, rendering them far less profitable to the Company. Defendants failed to timely disclose these material facts to investors.

### Defendants Included Revenue in Forecasts for New Business Which Was Not Likely to be Earned

86.     Because the sales cycle at Healthways was approximately four to six months long, defendants knew it would be difficult, if not impossible, to replace lost contract revenues and profits in the short-term, and if a cancellation occurred in the last half of the year, it would be especially difficult to replace the contract prior to the year-end.

87.     Forecasts for new business were compiled by sales, while operations submitted the actual revenues or business, and these two items were the basis for the revenue forecasts. Sales forecasts included four different categories of contracts; these were signed contracts (to be implemented and to earn revenues in a couple of months), "in discussion" (contract was being negotiated), contracts that were being "courted" (in preliminary discussions) and other (the client had not yet been identified but the Company was going to be identifying and pursuing a certain amount of revenue in the next six months). For contracts not yet signed, the probability of obtaining a signed contract was also factored into the forecast. During the Class Period, when anticipated revenues for fiscal 2008 became "tight" or were not likely to be obtained, defendants became overly optimistic about determining probability of future sales.

88.    The budget for fiscal year 2008 was started in April 2007 since the 2008 fiscal year started on September 1, 2007. Senior management insisted on a "huge" number for revenue, a 40% growth factor was applied to the prior year's revenue. 2008 revenue projections were projected by the "top" (senior management) and dictated "down" (to sales). The sales department was not asked for input about realistic projections for the year. Senior management did not ask and sales did not indicate that the revenue figure could be achieved. Defendants Chaput and Leedle were directly involved in this process and the projections involved and knew that this revenue figure could not be achieved as the number was too large. Each attended senior leadership and pipeline meetings where the unrealistic nature of the revenue projections were discussed. Defendants Hunter, Kelliher and Taylor were aware of the projections and the decisions that Leedle and Chaput had made to set revenue guidance for fiscal 2008 that could not be achieved.

89.    It was evident by the start of the Class Period that the revenue growth projections were too high. Not only was this evident because 40% growth would be difficult for any business, but the economy was declining and providers were trending toward providing disease management services in-house.

90.    Monthly pipeline reports, which estimated the total amount of potential new sales revenue and the likelihood of certain contracts being obtained were provided to Taylor. This distribution continued until Taylor left the Company in December 2007. Information was received from sales representatives about the various future sales opportunities and the likelihood that the sale would be completed.

91.    Starting in September 2007 and continuing each month, the pipeline figure was missing the revenue target in the budget. This fact was discussed at senior leadership meetings that were not pleasant to attend.

**Defendants Included Approximately $40 Million in Revenue from WellPoint in Their Fiscal 2008 Projections that They Knew Would Not Be Earned During Fiscal 2008**

92.     Defendants became aware during the Class Period that WellPoint, a customer which was forecasted to provide $40 million in revenue for fiscal 2008 would radically reduce the size of the anticipated relationship.   It was known by defendants that WellPoint which accounted for $40 million of fiscal 2008 projected revenue, would actually generate no more than $4 million in revenue.   Leedle and Chaput attended a meeting during January 2008 at which this reduction of anticipated revenue was discussed.   Defendants failed to timely disclose these material facts to investors.

93.     During the second part of 2007 and into early 2008, the sales pipeline experienced substantial decreases.  Included in this decrease was the WellPoint project, significant parts of which did not launch on time and for which projected revenue decreased dramatically.  Also, there were a number of "upsells" or additional programs that were supposed to be obtained on existing accounts that did not materialize.

94.     Healthways announced that WellPoint entered into a service agreement with the Company in March 2007.   Healthways included $40 million projected annual revenues from WellPoint in its fiscal 2008 budget.   This revenue was projected although the agreement between the two companies did not specifically layout the revenues that could be expected when the services were performed.   From the outset this relationship suffered from operational issues including problems with the WellPoint enrollment website.

95.     In order to meet guidance an additional $5 million was added to the WellPoint forecast for 2008.   The finance employee responsible for preparing sales pipeline reports simply received a revenue number from the WellPoint Account Manager Darren Spurgen, which was than included in the sales pipeline report.

96.     The WellPoint account was actually only to represent $4 million not $40 million in fiscal 2008 revenues.  These problems with WellPoint were discussed at a senior leadership meeting attended by Leedle and Chaput at the end of January 2008.  However, revising earnings or revenue guidance was not even discussed in this meeting at which the sales department was blamed for this failure.

## The Health Support Department's Projected Revenue for Fiscal 2008 Was Known to be Inaccurate

97.     Fiscal 2008 revenues projected during the Class Period by the Health Support Department, which provided screening and other health support functions to employers and insurance companies, were known not to be accurate.  The projected revenues for this department were not accurate because the operations managers who were responsible for compiling these projections were expected to inflate them by including  potential renewal revenues in the projections when the renewals by customers were unlikely.  Consequently, the revenue projections for the Health Support Department for fiscal 2008 were knowingly inflated.  As part of the projection process, operations managers reviewed customer contracts and "tallied up" the value in dollars, including contracts due for renewal (but not yet renewed) and pilots.  For pilots, there was no reason for the Company to believe that the customer would agree to continue the program after the pilot period; however, the Company would take the rates from the contract and multiply that by the number of employees expected to participate in the screening regardless of the likelihood of continuation.  For renewal contracts, operations managers were instructed to look at the number of employees that had participated in the program from the prior year and project that the same number of employees would participate the next year.

98.     For example, if 500 employees had been screened the previous year, operations managers would project that 500 employees would participate the following year.  Due to high cancelation rates for this program (as discussed below) this resulted in an unrealistic projection.  In

fact there was no independent data to indicate that the same number of individuals would participate. In addition, there was no positive indication that the customer was going to renew.

99. For new business, operations managers were instructed to project revenues for 80% of the eligible employees. As a result, operations managers would multiply the rate from the contract by 80% of the total employees at the customer company and input these projections into a homegrown system internally called T-Boss. Director of Finance (for the Health Support Department) Stacey Merrill and Kevin Cavender provided the directions for projecting revenues. Merrill took these figures from the system and compiled these forecasts to present to upper management.

100. Merrill would send an e-mail to the Operations Managers indicating when she needed the revenue forecast completed. Typically there was a monthly projection that needed to be completed before the 25th of the month because the billing was completed after the 25th. There were also quarterly projections, which Merrill used to show upper management. The T-Boss system was ineffective as it did not connect with any other systems used by Healthways, such as Oracle, which was used for Accounts Payable, and often information would be entered and it would completely disappear a couple days later.

101. The 80% projected participation figure for new business was inflated, as only approximately 50% of employees actually participated in the program. As a result, the revenues projected from new Health Support business were known to be inaccurate. The Company's projected revenues for this department deviated from actual participation rates, which was evidenced by the Company's billing system and the examiner's log, which listed which employees had blood drawn as part of the Health Support Department's My Health IQ program. A comparison of the log to the number of completed Health Risk Assessment ("HRA") forms also illustrated this deviation.

102.    As a result of these false revenue projections, the Health Support Department was unable to meet its revenue goal and suffered a multi-million dollar shortfall for fiscal 2008.  In fact, this department was not profitable at any time between 2006 and 2008.  During 2007, Merrill repeatedly informed the Operations group within Health Support that the department was not meeting its revenue goal.

103.    As a result of the poor financial results in the Health Support Department, Merrill dreaded the upper management meetings in which she presented projections.  Upper management "ripped her [Merrill] apart" in these quarterly meetings, which took place on the third floor of the building, where the Executive offices were located.

### The Health Support Department Suffered from Low Contract Renewals

104.    The Health Support Department provided screening and other health support functions to employers and insurance companies.  Within this department there were 6 operations managers responsible for 18-20 accounts each.  The Central product offered by the Health Support Department was My Health IQ.  This product provided screenings to the employees (or beneficiaries) of Healthways' customers in which blood was drawn and other vitals were recorded (such as height and weight).  At the same time, an HRA was also requested of the patient, which was a health questionnaire the employee filled out.  There were approximately 50 questions covering a wide range of health information, including smoking, family cancer history, eating habits and mental well-being, among other health-related questions.  Using this information, Healthways compiled a report which would assess whether an employee or insured was at risk for any diseases.  My Health IQ was focused on identifying people at risk for certain diseases and helping them to stay healthy.

105.    Between 2006 and 2008, the Company did not have the procedures and policies in place to implement the services provided by this program effectively.  For the most part, while customers were interested in the product, most were not happy with Healthways' performance

because the services promised in the contract were not effectively implemented. As a result, many customers complained frequently and most did not renew their contracts. Letters from customers were received detailing dissatisfaction with the Company. Customers either had an annual contract that could be renewed or a multi-year contract, which was typically three years. A clause in the typical multi-year contract allowed a customer to be released from the contract if it notified Healthways at least ninety days before the anniversary date. The services were so inadequate that customers typically expressed that they did not want to continue the program after the first year of service.

106.    The failure of this program was the result of the Company's inability to effectively implement these programs. There were a variety of reasons that the Company was not ready to roll out this program, including lack of training for Health Support Department employees.

107.    In addition, a number of customers were lost or did not renew because examiners, which were outsourced by Healthways to draw the blood for the screenings, showed up late to the site. Because subjects had to fast for eight hours before having their blood drawn, understandably, the employer would be quite upset if the examiner did not show up on time. Other examiners were unprofessional.

108.    Healthways outsourced through two companies called Hooper Holmes and EMSI. Since the examiners were outsourced, Healthways was unable to control the time at which the examiner appeared for the appointment or the quality of the services he provided. Since this exam was the most important component of the product, this made it difficult to deliver a quality product.

109.    Customers also became angry and canceled, as contracts indicated that Healthways would deliver the employee reports in a certain time frame, but Healthways repeatedly failed to do so. Healthways relied upon an outsourced lab company to process the blood and transfer that information to use in its report. However, the computer systems at the lab company and Healthways

did not communicate with each other and data would sometimes come over "skewed" and the Company had no mechanism in place to screen out bad data. As a result of these problems, customers were often unhappy and rarely renewed the service.

**Healthways Cost cutting Measures Affected the Company's Ability to Perform**

110. Analysis had been done by the Informatics group (now known as the Center for Information Technology or CIT) about the outcomes if certain changes were made to the products (to determine what would happen if billing rates were lowered). This group looked at call penetration, *i.e.*, the number of calls by the call centers, and constructed models to determine how many nurses were needed to meet the promises made to the client. Whenever Healthways needed to cut costs, the Company laid off nurses, but the direct results were that less calls were placed and client objectives were not achieved. The executive responsible for this group expressed her frustration to Leedle before leaving the Company.

**Defendants' False and Misleading Statements During the Class Period**

111. On July 5, 2007, Healthways issued a press release announcing the Company's financial results for the fiscal third quarter ended May 31, 2007. For the fiscal third quarter, Healthways reported total revenues of $167.9 million and net income of $10.8 million, or $0.26 per diluted share. The Company elaborated on the financial results:

> Earnings per diluted share for the Company's core commercial business were $0.43 for the third quarter of fiscal 2007, the high end of the Company's guidance and a 43% increase from $0.30 for the third quarter of the previous fiscal year. Revenues from the core commercial business increased 64% compared with the prior-year quarter. The Company incurred net costs of $0.12 per diluted share related to participation in two Medicare Health Support (MHS) pilots, compared with guidance for net costs of $0.10 per diluted share. Costs related to international initiatives were $0.02 per diluted share for the latest quarter compared with guidance for net costs of $0.03 per diluted share.

112. With respect to Healthways' backlog of contracts, the press release stated:

- ***Healthways signed 99 new, expanded or extended health plan or direct-to-employer contracts for fiscal 2007 to-date***. Since April 4, 2007, Healthways added 26 new, expanded or extended health plan or direct-to-employer contracts, bringing

the total for the fiscal year to-date to 99. *Of these 26 contracts, 23 were for Health Support programs and three were for Care Support offerings.* As a result, billed lives at the end of the third quarter increased sequentially by approximately 700,000, to 27.1 million from 26.4 million at the end of the second quarter of fiscal 2007, while available lives increased to 187.4 million from 184.8 million. In addition, the Company's backlog of annualized revenues of contracts signed but not yet implemented totaled $23 million at May 31, 2007, increasing to approximately $35 million currently.[4]

113.    In that same press release, Healthways touted the success of the Company's participation in the MHS pilot program:

> In announcing the decision to continue providing services under the Company's stand-alone MHS Phase I Pilot in Maryland and the District of Columbia, Leedle said, "This decision is about our assessment of the risk/reward factors associated with MHS. Simply put, the risk of our continuing to participate is quantifiable – in terms of both dollars and time – and is relatively small as compared to the significant opportunity associated with a potential Phase II expansion of the MHS program. *Should a Phase II expansion occur – and as a result of our intensive work with CMS over the past six months, we now believe it will – we would have the opportunity to serve the largest unpenetrated domestic market.* Given the Company's enhanced Health and Care Support capabilities, that market will represent approximately 42 million available lives and approximately $22 billion in potential revenue."

> "Of course, expansion to Phase II is predicated on program performance in Phase I," Leedle added. "Our analysis continues to show that our solution is working. *At this point in the pilot, our analysis shows that we are exceeding all of the clinical and satisfaction metrics of success for the entire population, and we are – again based on our own analysis – producing positive financial results with respect to large, readily identifiable subsets of the population. This performance leads us to believe that we have an excellent chance of participating in Phase II, should it be implemented.*"

> *        *        *

> Leedle concluded, "We believe the benefits of having the opportunity to establish a strong position in this large and growing market justify the cost of the anticipated investment, and therefore, the decision to proceed with our Maryland/Washington, D.C. pilot is in the best long-term interests of the Company's stockholders."

> *        *        *

---

[4]    Here, as elsewhere, emphasis has been added unless otherwise noted.

"Our investments in our international business and the MHS pilots have the potential to create substantial, additional profitable growth and stockholder value, while expanding our market leadership position and advancing our mission to improve health outcomes and reduce costs for millions of people around the world. . . ."

114.    Defendant Leedle also made the following statements regarding Healthways' Health

Support program:

*"Our results reflect significant and sustained demand from existing and new customers for a wide variety of services across our comprehensive suite of Health and Care Support<sup>SM</sup> programs*."

                              *       *       *

*"Our contracting experience has already demonstrated that our significantly enhanced Health Support<sup>SM</sup> capabilities position us well to respond with comprehensive, differentiated solutions to the market's increasing demand, evidenced by the current requests for proposal we are receiving for single-source Health and Care Support services*."

115.    With regard to the Company's financial guidance for 2007, Healthways stated:

**Financial Guidance**

Revenue

Healthways today revised its financial guidance for fiscal 2007 revenues to reflect its expectation that it will not recognize performance-based revenues under its Phase I MHS pilots.  The Company affirmed its established guidance for its core commercial business and international initiative.  The Company's revised guidance for total revenues for fiscal 2007 in a range of $618 million to $630 million compared with the previous range of $640 million to $659 million.

                              *       *       *

Earnings

The Company today also revised its guidance for earnings per diluted share for fiscal 2007 to a range of $1.21 to $1.22 compared with the previous range of $1.44 to $1.61.  The new range reflects (i) an increase in guidance for core commercial earnings per diluted share to a range of $1.76 to $1.77 from the previous range of $1.68 to $1.74; (ii) net costs for the MHS pilots of $0.45 per diluted share, consistent with the Company's revised expectations for MHS pilot revenues; and (iii) costs of $0.10 per diluted share attributable to securing, but not implementing or operating, an international contract, one of which the Company expects to sign during the fourth quarter.  Some implementation and operating expense is expected during the fourth quarter once a contract is secured, the level of which depends on the timing of that contract signing.

116.    Later that same day, in his prepared remarks at the investor conference call,

Defendant Leedle spoke about the MHS pilot programs:

> For the past six months, as most of you know, we have been working diligently in partnership with CMS to gain a better understanding of the factors that have been negatively affecting performance, such as the impact of the first six-month engagement period, that are really unique to these pilots. As a result of those efforts with CMS, we are confident that this population exhibits the same intervention dose response and time in program critical performance characteristics that we see in our commercial and Medicare Advantage populations, where we have experienced great success. We also believe, based on our analysis, that we are exceeding the clinical and satisfaction performance targets established in our cooperative agreement, in that for certain critical mass segments of the population making a significant positive impact on costs.
>
> While we had hoped that these efforts would lead CMS to modify the current cooperative agreement, thereby increasing the likelihood of performance-based revenue recognition during the remainder of the pilot term, that has not occurred. **_Our single most important objective, however, was to create recognition of these impacts, and have CMS conclude that they should be taken into account in the final evaluation of Phase I performance. Based on our extensive interactions with MHS staff and CMS leadership, we now believe that will happen_**.
>
> We have also gained clarity over the past six months with respect to the route to Phase II that CMS is mapping. **_Accordingly, we now believe that, while not guaranteed, a Phase II expansion is likely to occur, and our assessment of our performance leads us to believe that we have an excellent chance of participating_**.
>
> We continue to believe that the fastest, surest way to Phase II is participation in Phase I. Given the relatively small amount of the continuing investment and the significant opportunity Phase II represents, we believe this investment is well worth making, and one that we believe will be in the long-term interest of our shareholders, of our company, our industry, the Medicare program and, perhaps most importantly, the approximately 42 million individuals who make up our country's most vulnerable population, who would otherwise be denied the proven benefits that Health and Care Support programs can provide.
>
> Our decision to continue in the pilot was not easy to reach, and would have been impossible to make without the significant engagement and exhaustive efforts CMS has made since early January. While our work is far from complete, we are appreciative and confident of their continuing commitment to the Medical Health Support.
>
> As a result of continuing our participation, our MHS guidance for the fourth quarter, for full year fiscal 2007 and for fiscal 2008 reflects only our expected costs for continuing the pilots, offset somewhat by the contractual fixed revenues from CIGNA on the Georgia pilot. Accordingly, the guidance represents the maximum

investment exposure, assuming CIGNA continues with their pilot, that's associated with our decision to continue our participation.

\*　　\*　　\*

The decline in MHS revenues in the quarter was a result of our quarterly performance measurements against the increasing performance targets under our current agreement with CMS, which required us to reverse the remaining $1.8 million of previously recorded performance-based revenues. This was somewhat offset by the recording of fixed-fee revenues of approximately $1.1 million from our pilot with CIGNA. Although declining slightly every quarter, costs remained fairly consistent at approximately $6 million, so the net cost impact on the MHS pilots for this quarter was $0.12.

117.　　During the Q &A portion of this same conference call, Defendant Leedle responded

to several questions regarding the MHS pilots:

> *Q:　　(R. Daniels): A couple quick questions on Medicare. First off, Mary, you mentioned that you reversed about $1.8 million in the quarter. Does that, then, the [sic] made all the recognized revenue, so we don't have to worry about any reversals in the future*?

> *A:　　(M. Chaput): That is correct*.

\*　　\*　　\*

> Q:　　(R. Daniels): On the Phase II you mentioned, it sounds like you have a higher level of confidence that this can go forward, especially once you get the 24 months of data required by law. Can you give us a little bit better feel for what you need to see over the next couple of quarters to continue with this? Or are you pretty much set now that you are going to go through the entire pilot of Phase I, regardless of what you hear from CMS along the way?

> A:　　(B. Leedle): Yes. We are expecting, obviously, with the news that we shared today, to commit to completing the pilot. I would tell you a lot more of the same, given the fact that we have gone through a tremendous amount of learning now, almost two years into this, that we would want to continue to enhance what are already really stellar results around provider and beneficiary satisfaction and clinical care improvement, for the reference that we have made to significance subpopulations having very positive cost impact to continue to expand and to grow that going forward over the next year. All those things play into helping improve the certainty and the probability of a Phase II and of our participation in Phase II.

\*　　\*　　\*

> Q:　　(J. Raskin): First question, I guess, just around CMS. It did sound as though you had a higher level of conviction, that CMS is sort of going to change their mind. I guess they didn't agree to allow a change in the current phase, but I guess I'm

curious what gives you that comfort that they are going to change their mind in terms of the review process, and therefore allow a Phase II?

A:     (B. Leedle): I think where we go back to with base confidence is the statute itself, what is law today. The things that we've pointed out that we spent the last six months with CMS on have been looking at the law and how that then gets interpreted in terms of understanding performance.

We also believe that, as per plan, CMS has independent third party that's evaluating this effort. You may or may not have noted that, just a little while prior to our call, what was posted by CMS was the first six months of the Medicare Health Support report to Congress. While it's very preliminary and we've had a review of the base findings there and it's limited to essentially the engagement period for all the MHSO's pilots, the findings are validating of what we believed we had learned and shared an in addition to that, we believe, tied to the implications from the analysis that we've spent the last six months on.

So the pieces that  begin to build a much higher confidence level are the thought processes and how to move forward with Phase II, and in doing so, how to evaluate per the statute Phase I performance. We are confident that that will be done in light that puts us in a good position, based on our analysis.

So I think getting modification – I would just note it this way. Getting modification of any of the cooperative agreements by any individual MHSO requires, really, that a blanket change would occur across all MHSOs. So you may not want to interpret a willingness to change or modify was limited to a decision with CMS. You may want to consider the fact that consensus requirement around those modifications would have had to have been met across all the awardees. So I'll leave it at that.

*     *     *

Q:     (B. O'Neil): So you expect to continue to record revenue in that account over the next 15 months, and then you're just going to sort of see what happens, in terms of negotiating with CMS regarding any possible revenue recognition?

A:     (M. Chaput): That is correct, other than it is not revenue that we will be putting on the balance sheet. It will be the cash or the billings in excess of revenues earned.

Q:     (B. O'Neil): Okay, I'm sorry, you are right. I hate to say is [sic] in the most stark way. But let me be sure I'm understanding what you've said so far. I think you've said, as it relates to MHS, you're not performing now and you are not likely to perform. Number two, you're not likely to get an adjustment, so the loss will continue throughout 2008 [with the] revenue recognition, and at least at this point there's nothing definite regarding Phase II. Is that a reasonable way to characterize were we are at right now?

A:     (B. Leedle): Well, I think at a high level, I don't know that you're inaccurate. However, I think words mean everything. So you referenced that we are not

performing now. There are multiple performance criteria related to being able to advance to Phase II.

Phase I performance to date – we're exceeding two of the three metrics. On the third metric, where we are not exceeding – that's the financial savings – we are having significant financial impact as critical subpopulations have been studied. I think we have been clear to point out, I think the report to Congress will point out, that during the first six months for which all the MHSOs are bearing the financial impact of that into the measurement methodology, is a tough hurdle to overcome.

So what we are telling you is, without modification to the cooperative agreement from under which we operate currently, the part of your statement that's true is we are not recognizing any of the performance revenue, and we would not expect to without further change or modifications going forward. Again, our goal and objectives stated that we would love for these to be very clearly profitable as pilots in and of themselves, but that's not the sole reason why we got into this. The reason we got into this was to open a new market for 42 million Medicare beneficiaries, with a full breadth of expansion opportunity for Health and Care Support services.

***We believe, based on own analysis and the work that we have done with CMS over the last six months, that there's a high likelihood for a Phase II, and we're confident of our opportunity to participate***. ***No guarantees, but we're in a positive, confident mode related to that***.

\*        \*        \*

Q:      (B. O'Neil): When we talked at the end of May, I think we all came away that some sense that you believed there was a reasonable chance you'd get a modification in the agreement on Phase I with CMS. So my question is, at this point, are there substantive issues with CMS, or are there substantive issues with the other MHSOs that might preclude your getting a modification over next several quarters? If so, what are they?

A:      (B. Leedle): Yes. I would just tell you I think the comments that I made related to the fact that the one thing CMS has consistently done is that any prior changes or clarifications or definitions that they provided that weren't clear under the cooperative agreements have been addressed consistently across all the MHSOs. I think they made it abundantly clear that if they were going to take into account and/or modify the cooperative agreements, that they needed to do so at a universal level across all the awards, which then that puts the ball back in the camp of all the awardees to come to conclusion and consensus around what those modifications ought to be, and that's not so simple.

\*        \*        \*

Q:      (N. Juhng): Obviously, if you think Phase II is something that arguably could be imminent over the next two to three years, then you would want to stick it in Phase I. But what I'm struggling with here is the cost pressure that Medicare is

seeing. Wouldn't the financial savings be the predominant factor with which they decide whether or not to continue with these pilots?

A:    (B. Leedle): I think, absolutely. I think it's been the predominant factor as they went into this. I think they would not accept reduction in cost or cost savings at the expense of beneficiary provider satisfaction, or that you got there in a way that denied care. So having the other metrics around the performance coupled with the savings is a complete recipe. But if I were to say which of those ways is the greatest, in terms of their interest and concern, it is to obviously see the savings.

I think we have been pretty clear. I'm trying to be as clear as I can that there are some obvious issues around the way the pilots were constructed for the purpose of creating randomization control trial that may have created or even unintended variants crept into the scenario, which alters the way in which performance is looked at on whole, and that's why we spent so much time working with CMS to try to get an understanding of subpopulations in this work, to find out where there were segments where there was meaningful financial savings, and then to analyze that with respect to was that chance or was that linked to the interventions, and could you see a growing and increasing performance in those savings in that group related to those interventions over time?

*That's in the category of, does what we do work? In the end of the day, as we looked at this with CMS, we believe what we are doing works. We think the way in which performance financially is measured under this cooperative agreement without modification is not going to allow us to see that on whole. But we are confident that CMS is looking and will address the subpopulation analysis as well as their third-party evaluator, and that we do not believe CMS is going to advance going forward unless there's a meaningful story around the financial savings. That ought to give you some sense about our decision and how strong we think our performance is within critical mass subsets of this population.*

Q:    (N. Juhng): That's very helpful. I understand where you are coming from here, and the fact that you believe that this is something that you are performing well and bringing a lot to the table. Obviously, the data is still not really necessarily supporting everything that you have been looking at; otherwise, you may have gotten the modification.

But what I am looking at is going forward, whether or not – because your confidence level is saying that Phase II is around the quarter, two to three years – two to three years. But what I'm trying to figure out is whether or not if the flaws that you pointed out make them think that maybe they need to run another pilot, another Phase I, to work that through, or whether or not the mistakes that were made in the structure of the pilots for you guys and the difficulties that you had to go through, whether or not they are going to be able to take that next step to get to Phase II, or whether or not they are going to say, look, we need to rerun this and do it with the right starting point.

A:    (B. Leedle): I think part of the reason why we passed on previous demos with CMS – not cooperative agreement but demos – were because there was no definitive

endpoint and no definitive steps that could be taken, whether you had success or failure. The attractive part of participating in Phase I wasn't Phase I for itself; we just wouldn't have signed on for here's a 100% pilot for the next three years, in and of itself and then with no clear steps.

I would draw you back to the statute, to the law. Clearly, in there indicates that the analysis is not only done on whole, but on some parts and components of this pilot. It is on the strength of the components tied with the statute that gives us the confidence that we would be able to show success, as defined the way in which Congress is going to expect to see it.

118. On July 9, 2007, Healthways filed its Form 10-Q for third quarter fiscal 2007. In the Form 10-Q, Healthways repeated the financial results that it had announced in the July 5, 2007 earnings release.

119. The statements referenced in ¶¶111-118 were materially false and/or misleading when made because they misrepresented and failed to disclose that:

(a) Healthways' MHS pilot was not successful as the Company could not meet the 5% savings target or even the modified break even savings target sought from CMS;

(b) Healthways was unlikely to participate in any Phase II of the CMS MHS pilot as it could not successfully complete Phase I;

(c) Phase II of the CMS MHS pilot was not likely to occur as Healthways and other providers were unable to meet either the 5% savings target or even a modified break-even target;

(d) There was not significant sustained demand for Health Support programs as major customers including Blue Cross of Minnesota, Blue Cross of Massachusetts and Wellmark were canceling contracts or renegotiating them to require the provision of more services at the same price thus rendering the contracts materially less profitable; and

(e) There was not significant sustained demand for Health Support programs as insurance providers were trending toward providing disease management in house, the quality of Healthways' programs were poor, Healthways was losing contracts, being required to provide

additional services for the same price, rebating fees and experiencing slower enrollment in existing contracts due to a decline in need for the company's services.

120.    Defendants failure to disclose the above material facts in the MD&A section of the Company's 3Q07 Form 10-Q violated SAB 99, SOP 94-6 and the duty to disclose or abstain from trading.

121.    On October 17, 2007, Healthways issued a release announcing its financial results for the fiscal fourth quarter and year end of 2007, the period ended August 31, 2007. For the quarter, the Company reported total revenues of $170.4 million, and net income of $11.5 million, or $0.31 per diluted share. Defendant Leedle, commenting on the results, stated, in pertinent part, as follows:

> We are pleased with Healthways' performance for both the fourth quarter and fiscal 2007. Our core commercial business earnings met or exceeded the high end of our earnings guidance each quarter throughout the fiscal year. These earnings contributed to the 50% growth in the Company's overall [earnings before interest, taxes, depreciation and amortization ("EBITDA")] for the fiscal year to $130.5 million from $86.7 million for fiscal 2006, which, despite the increased cost of both our international and MHS initiatives in fiscal 2007, drove a slight improvement in EBITDA as a percentage of revenues.
>
> We achieved these results even as we continued to invest in enhanced product offerings that significantly expand our ability to meaningfully engage every person within a given population, regardless of age or health status, with solutions proven to maintain or improve their health and productivity. These investments are consistent with the long history of innovation and thought leadership that have led to our current market position and will fuel our continuing drive toward integrated, personalized and comprehensive WholeHealth solutions. At the same time, we are being presented with substantial new growth opportunities for our current solutions from both our existing base of available lives and potential new customers, both domestically and abroad.
>
> The strong sales momentum we have built was again evident in the growth of our core commercial revenues, which increased 53% for the fourth quarter and 54% for the full fiscal year when compared with the same periods in the prior year. The Axia acquisition completed in December 2006 contributed significantly to this growth. Core commercial earnings for the fourth quarter exceeded our guidance, even after accounting for the impact of Axia integration; preparation for large contract implementations; and somewhat lower than expected summer utilization of our seniors' physical activity program, SilverSneakers(R).
>
> Our expanding growth prospects were also demonstrated by the fourth-quarter announcement of our first international contract, a three-year agreement with

Deutsche Angestellten Krankenkasse (DAK), Germany, to provide Health and Care Support(SM) solutions for a portion of its members with chronic diseases. Our costs related to this contract and other international efforts were $0.06 per diluted share for the fourth quarter, $0.02 higher than expected, which were offset by better than expected fourth-quarter results for both our core commercial business and for the two Medicare Health Support (MHS) pilots in which we participate.

*      *      *

We produced another year of significant profitable growth for fiscal 2007, while further strengthening our position of industry leadership. We believe our success reflects our ability to provide validated outcomes at scale, even as we continue to enhance our value proposition through industry transforming innovation. As a result of our accomplishments during the fiscal year, such as the completion of the Axia acquisition, the progress and learning achieved in our MHS pilots and the signing of our first international Health and Care Support contract, we believe our prospects for long-term growth have increased substantially. We remain confident that, as we continue to build toward our vision of fully integrated, personalized WholeHealth solutions, the further expansion of our value proposition will drive a complementary and long-term expansion of our revenue and profit growth opportunities.

122. With regard to the Company's backlog of contracts, the press release stated:

Significant backlog and strong pipeline of potential contracts. Healthways' backlog of annualized revenues for contracts signed but not yet implemented at the end of fiscal 2007 totaled approximately $40 million. Contracts signed since the end of fiscal 2007 have increased the backlog by approximately $6 million.

In addition, Healthways' pipeline of potential contracts continues to expand. This demand reflects the growing recognition among health plans and self-insured employers of the increasing healthcare cost management and productivity improvement benefits to be gained by addressing the health needs of every individual in their specific populations. ***The Company believes the current strength of the pipeline reflects its unique and demonstrated ability to drive meaningful outcomes, at scale, across its comprehensive and differentiated continuum of Health and Care Support solutions***.

123. With regard to the Company's financial guidance for 2008, the release stated:

**Financial Guidance**

<u>Revenue</u>

***Healthways today established its guidance for revenues for fiscal 2008 in a range of $782 million to $815 million***. The implied 27% to 32% growth over fiscal 2007 revenues that this range represents is consistent with the Company's expectation of sustainable growth in its domestic revenues. In addition, Healthways expects to record its first revenues related to the DAK international contract during fiscal 2008 in a range of $8 million to $10 million. In prior years the Company reported its

domestic operations separately as core commercial operations and the MHS pilots. However, given the relative size of the MHS pilots to the rest of the business, their limited remaining term and relative financial predictability, the Company will be reporting these results with the core commercial results on a combined basis for fiscal 2008 as our "domestic" business. While the Company does not anticipate any performance revenues from its MHS pilots for fiscal 2008, its domestic guidance does include revenues in a range of $4 million to $5 million from fixed payments related to the Company's participation in the CIGNA Phase I pilot.

*     *     *

Earnings

***The Company today also established its guidance for earnings per diluted share for fiscal 2008 in a range of $1.77 to $1.86***, or 45% to 52% above $1.22 for fiscal 2007. Consistent with previous years, the substantial continuing growth of our core commercial business is expected to fund the costs of the remaining term of the MHS Phase I pilots and the early stage of international initiatives. Healthways' guidance for fiscal 2008 earnings per diluted share for the domestic business is in a range of $1.88 to $1.95, which includes anticipated costs of $0.10 related to the Company's move into a new consolidated enterprise headquarters and an expected net cost impact of the MHS pilots of approximately $0.25. The Company's guidance for fiscal 2008 earnings per diluted share is also based on expected net costs in a range of $0.09 to $0.11 related to Healthways' international business.

124.     Also on October 17, 2007, Healthways held an investor conference call to discuss the fourth quarter 2007 earnings press release. In his prepared remarks, Defendant Leedle addressed both Healthways' backlog and its MHS pilot programs:

We added more than one million build [sic] lives in just the second half of fiscal 2007, compared with about 1/2 that number for all of fiscal 2006. In addition, our backlog of annualized revenues from contracts signed but not implement at year-end stood at $40 million compared with $7 million at the same time a year earlier. . . .

[D]espite our continuing positive interactions with CMS, I can update you that nothing has yet occurred that materially changes the discussions we had in our third quarter release and conference call about either our MHS pilots or anything to come after the pilots. Accordingly, our fourth quarter results and our guidance for 2008 costs, with respect to MHS, remain the same as we presented to you last quarter. Nevertheless, our commitment to the MHS process remains firm. While there are no guarantees about whether there will be a phase two or whether we'll participate, we are confident first of our ability to maintain or improve the outcomes of the Medicare population while lowering its health care costs. Second, of the very large need and opportunity that the aggregate Medicare market represents and, third, that the best path we have towards any potential phase two participation is through completion of the work that we began in phase one.

125.    CFO Chaput also made the following statements concerning the MHS pilots:

The net cost impact from the MHS phase one pilot in the fourth quarter was $0.08, $0.01 better than our guidance for a total year net cost impact of $0.44. Total [Generally Accepted Accounting Principles ("GAAP")] EPS for our fourth quarter of $0.31 was on the high end of our guidance. Operating cash flow in fiscal 2007 totaled approximately $107 million for the year. We ended the year with approximately $48 million in cash, following cash expenditures of $151 million in acquisitions and investments, the pay down of $51 million in debt, and the repurchase of approximately $6 million of stock. As expected, capital expenditures for the year totaled $30 million, lower than we originally anticipated, a result of the timing of new sold business that will be implemented in fiscal 2008. For fiscal 2008, we expect total company revenues to be in the range of $782 to $815 million, which would represent a 27 to 32% increase over fiscal 2007. Domestic revenues in fiscal 2008 are expected to be in the rage [sic] of $774 to $805 million, a 26% to 31% increase over domestic revenues in fiscal 2007. This amount includes expected fixed fee revenues from the MHS pilots of $4 to $5 million.

Given the relative size, term, and financial predictability of the MHS phase one pilots, we will be combining the results of what we have previously referred to as our core commercial operations with the MHS pilots and reporting them as one number for our domestic market going forward. We will continue to report international operations separately and will, of course, provide you necessary details regarding the MHS pilots and their financial impact as new events warrant. International revenues from the newly signed contract with DAK in Germany, which goes live on January 1, are expected to be in the range of $8 to $10 million. Some of the dynamics that we anticipate in the year ahead includes significant contract starts in our second quarter, primarily on January 1, related to the backlog that Ben mentioned earlier. We expect first quarter revenues to be slightly higher than the fourth quarter of fiscal 2007, and increasingly stronger revenue growth over the remainder of the year. This seasonality reflects an aspect of an increase in the mix of Health Support solutions being provided primarily to self-insured employers. Overall, we expect EBITDA margins in 2008 to be consistent with 2007.

We anticipate that there will be costs in our first quarter associated with the preparation for those January 1 contract starts, including an unprecedented expansion of infrastructure, including three new domestic care enhancement centers in the first half of the fiscal year. In addition to the upfront costs of the management team, recruiting, hiring and training of the clinicians and coaches to deliver on those contracts, and the development of data exchange processes and analysis with our new customers. As a result of those dynamics, we anticipate that the contribution to EPS from our domestic business in our first fiscal quarter will be in the range of $0.33 to $0.34. The ongoing activities of the international business development team and the first quarter net cost impact of preparing for a January 1 start of our international contract is expected to be in the range of $0.05 to $0.06. Contribution to EPS from our domestic business for fiscal 2008 is expected to be in the range of $1.88 to $1.95, a 40 to 46% increase over 2007 which includes approximately $6 million, or $0.10 of costs, in 2008 associated with our move into our new headquarters. That $6 million

includes moving costs, duplicate rent for a short period of time, and an expected write-off of certain fixed assets, primarily furniture and fixtures.

The net cost impact of the last year of the phase one MHS pilots, which is included in this EPS range for our domestic business, is expected to be, as we have previously discussed, approximately $0.25. Total company GAAP EPS guidance is expected to be in the range of $1.77 to $1.86 or 45% to 52% increase over fiscal 2007. We expect the total year net costs impact from our international business to be in the range of $0.09 to $0.11 since the eight months of revenue from the DAK contract will not be sufficient in that fiscal year to offset the upfront costs of both preparation and the full year costs of the international team. This guide does not include the impact of any new international contracts that may be signed during fiscal 2008.

126.    Defendant Leedle also responded to questions regarding the MHS pilots during the

question-and-answer portion of the conference call:

Q:    (T. Carroll): Quickly, on the MHS program, it sounds like you're rolling that performance into your domestic bucket of reporting. If MHS impacts this category either in a very unexpectedly favorable or unexpectedly unfavorable way, can we expect you guys to provide visibility on that or is it just going to be hey, here's the number?

A:    (B. Leedle): No, we're not ging [sic] dark on you on MHS, as we looked at the relative size of that portion of our business and the steps that we went to basically forecast and clarify for all of you what the downside impact of this was through 2008 from back at our third quarter earnings, we felt like at this point, given the size of our domestic market and how we're looking at both organizing ourselves and moving forward strategically, you want to think of this as a line of business inside of domestic as we go forward, we're not going to stop talking about it and we promise you that we'll keep you up-to-date when things happen and we'll do that. You're not going to have to guess what's going on.

                            *        *        *

Q:    (B. O'Neil): Hi guys. Couple of follow-on questions. I have been hearing some fairly optimistic talk about the potential for changes in the performance criteria related to MHS. Based on your comments, I am assuming you're not currently expecting any changes in the – in those criteria during your fiscal '08 period, is that right? Can you just give us any additional color on what the discussions have been and why or why not we might see changes?

A:    (B. Leedle): Yes. I don't know what you're hearing, Brooks and so I'm interested in what you're hearing. *It's not that there isn't conversation about changes as it relates to the implications of design issues, implications of data, implications about possibility moving the performance bar from a 5% net to budget neutrality, all of that's in the works. We shared that at the end of the third quarter.* Until there's something definitive, there's nothing for me to be able to share with

you. So, it doesn't mean that there isn't onversations [sic] or work being done, and I just remind you, there are other parties in the government involved other than CMS that are implicated in some of those changes. So, those are inside government workings and then there's always continued conversations with CMS with the awardies [sic] and so nobody's stopped talking and nobody's stopped working on this, but as I told you guys more than 90 days ago, we're done trying to forecast and predict around when definitive decisions, and not just the decision, but on that decision the definitive reconciliation of its implications would put us in a position to talk about what that means to us both strategically and financially. So, we're not trying to be purposefully not exact about this, but there's just really nothing new that we can share with you.

127. Upon this news, shares of the Company's stock rose $4.33 per share, or 8%, to close at $57.58 per share, on heavy trading volume.

128. On October 27, 2007, the Company filed a Form 10-K with the SEC, which included audited financial statements for fiscal year 2007.

129. The statements referenced in ¶¶121-128 were materially false and/or misleading when made because they misrepresented and failed to disclose that:

(a)     The Company did not have a demonstrated ability to drive meaningful Health Support outcomes as the quality of it Health Support programs were poor;

(b)     The Company's pipeline was not strong, as insurance providers were trending toward providing disease management in house, the quality of Healthways' programs were poor, Healthways was losing contracts, being required to provide additional services for the same price, rebating fees and experiencing slower enrollment in existing contracts due to a decline in need for the company's services and an inability to meet promised savings targets;

(c)     The Company was unable to meet the guidance it established for fiscal 2008 due to cancelations and/or unfavorable renegotiations of major contracts including Blue Cross of Minnesota, Blue Cross of Massachusetts and Wellmark and because the Company had included projected revenues for contracts that it knew would not be earned during fiscal 2008, including $40 million of revenue from WellPoint; and

(d)     Healthways' MHS pilot was not successful as the Company could not meet either the 5% savings target or even the modified break even savings target sought from CMS.

130.    Defendants failure to disclose the above material facts in the MD&A section of the Company's fiscal 2007 Form 10-K and its 3Q07 Form 10-Q violated SAB 99, SOP 94-6 and the duty to disclose or abstain from trading.

131.    On December 19, 2007, Healthways issued a press release announcing its financial results for the fiscal first quarter of 2008, the period ended November 30, 2007.  For the quarter, the Company reported total revenues of $175.8 million and net income of $11.2 million, or $0.30 per diluted share.  Defendant Leedle, commenting on the results, stated, in pertinent part:

> "Our first-quarter financial results represent a solid start to fiscal 2008, with earnings slightly ahead of our guidance and with substantial and sustained sales momentum contributing to a backlog of annualized revenue at the quarter's end of $51 million. In addition, since the beginning of the second quarter, we have added $10 million to the backlog. ***This backlog reflects strong continuing demand in both our health plan and employer markets, as we have added or expanded programs with 12 health plans and 51 employers since the beginning of fiscal 2008.***"

> "***These contracts, as well as our significant pipeline of potential contracts, include both existing customers and new health plans and large self-insured employers.  They also incorporate single and bundled services across our comprehensive continuum of Health and Care Support(SM) solutions, including contracts with***:

>> •     New customer, Independence Blue Cross, to provide our SilverSneakers(R) program to their Medicare Advantage members;

>> •     New customer, Excellus BlueCross BlueShield, to provide Health Support(SM) solutions to their members;

>> •     ***Current customer, CareFirst BlueCross BlueShield, to expand services to provide our impact conditions program***;

>> •     ***Current customer, Blue Cross Blue Shield of Massachusetts, to expand services to include access to our CAM/Chiro network***; and

>> •     Current customer, Rocky Mountain Health Plans, for comprehensive integrated Health and Care Support services."

> "In addition, we continue to experience increasing interest in our comprehensive integrated solution, which supports individuals in living a better life,

regardless of their past, current and future health circumstances. The value proposition for health plan and employer customers is healthier individuals who cost less and are significantly more productive, driving higher performance. We expect the expansion of this value proposition to support further contracting success during the remainder of fiscal 2008, and beyond."

"*As anticipated, our expanded Health Support solutions were primarily accountable for the substantial increase in our revenue for the first quarter of fiscal 2008 compared with the first quarter of fiscal 2007*. This growth produced a 29% increase in EBITDA, to $34.8 million for the first quarter of fiscal 2008 from $26.9 million for the first quarter of fiscal 2007. The increase in EBITDA for the comparable periods occurred even with continued integration costs from the Axia transaction, initial costs associated with four new call centers and other costs associated with preparation for new contracts scheduled to begin operations early in 2008."

\*        \*        \*

"Billed lives of 26.7 million at the end of the first quarter remained at a penetration rate of approximately 15% of our total available lives of 183.4 million at the quarter's end. Consistent with prior years, we expect our billed lives to increase in our second quarter as a result of the scheduled launch of contracts at the beginning of the new calendar year."

"Domestic results for the first quarter continued to include costs associated with our participation in two Medicare Health Support ("MHS") pilots and were in line with our expectations. Our international results were slightly better than anticipated and included costs associated with the implementation of our first contract in Germany, including the development of the new call center in Berlin, as well as other costs related to the continuing development of our international business."

\*        \*        \*

"*As our guidance implies, we are confident that our expanding ability to create value provides us substantial growth opportunities for fiscal 2008 and beyond*. Over the near term, we expect to grow primarily by adding billed lives through expanded services within our existing customer base. In addition, we are successfully expanding our addressable markets by the addition of new health plan and employer customers domestically and through the anticipated launch of our first international contract in Germany on January 1, 2008. We also remain fundamentally committed to enhancing our value proposition through continuous innovation. Consistent with our history of driving industry change through innovation, we are confident that our next-generation solutions will significantly expand our market opportunity and our prospects for increased stockholder value."

132.    With regard to the Company's financial guidance for 2008, the press release stated:

**Financial Guidance**

Revenue

***Healthways today affirmed its guidance for revenues for fiscal 2008*** in a range of $782 million to $815 million.  Further, Healthways expects to record its first revenues related to the contract in Germany with Deutsche Angestellten Krankenkasse (DAK) during fiscal 2008 in a range of $8 million to $10 million.  The anticipated growth is consistent with our goal of sustained annual revenue growth of 25% or greater.

*        *        *

Earnings

***The Company today also affirmed its guidance for earnings per diluted share for fiscal 2008*** in a range of $1.77 to $1.86, or 45% to 52% above $1.22 for fiscal 2007.  Healthways' guidance for fiscal 2008 earnings per diluted share for the domestic business is in a range of $1.88 to $1.95, which includes an expected net cost impact of the MHS pilots of approximately $0.25.  The Company's guidance for fiscal 2008 earnings per diluted share is also based on expected net costs in a range of $0.09 to $0.11 related to Healthways' international business.

133.    Also on December 19, 2007, Healthways held a conference call to discuss the first quarter 2008 press release.  In Defendant Leedle's prepared remarks, he made the following statement regarding the MHS pilots:

[W]e are also continuing to expand our overall opportunity by adding new addressable markets.  We've previously discussed with you the potential represented by adding Germany as an addressable market through our first international contract with DAK, as well as the potential Medicare opportunity represented by our participation in the MHS pilots.

134.    During the question-and-answer portion of the December 19, 2007 conference call, Defendant Leedle made the following statements regarding the MHS pilots:

Q:      (A. Henderson): Okay, that is very helpful.  Thank you.  And then one last question and I will jump back in the queue.  There has been some discussion here recently that CMS and the OMB might be getting close to possibly reducing the hurdle, the 5% savings hurdle, on this Medicare Phase I pilot.  Can you comment on what you're hearing on that and if those discussions are actually taking place right now?

A:      (B. Leedle): Well, we know that there is ongoing discussions within the government to the different areas with each other. We will be notified when things are final, and we have not been notified. So that is about all I can tell you at this point.

*       *       *

Q:      (J. Kumpel): That is very comprehensive. I appreciate that. On the Medicare front, I was curious if you could clarify on two points, one on MHS. Can you just remind us of your responsibilities in terms of returning cash or fees at the end of the project, what the criteria are?

And then secondly, separate from MHS, I was curious if you could talk about whether or not you actually competed for the senior risk reduction demonstration projects that got awarded today?

A:      (B. Leedle): Sure. So let me answer the first one. I think it is pretty widely known that the fees paid by CMS to participant awardees for MHS were paid on the basis of target performance. I think you also noted that there has been a little difficulty within the context of the ability to measure performance. And so this is a corporate debt agreement, which is different than a typical government contract.

And so the intent was that if all systems were go in and around data research design and the ability to measure performance, that it would have been a very simple measurement of either met or not met. And if met, we keep; if not met, we return on a pro rata basis down to returning all the fees if there was that lack of performance.

We think that there is work still ongoing by CMS to try to address the artifacts that have impacted the ability to cleanly look at performance. And at this point, it is probably best for me not to try to get into forecasting the likelihood of the disposition of what is on our balance sheet as billings in excess of earnings amount related to this. So you are just going to have to stay[] with us as we stay tuned with the process.

135.    Defendant Leedle also fielded a question concerning the WellPoint contract:

Q:      (B. O'Neil): I will just ask one more. I recall that you announced a fairly what I thought potentially was quite significant contract with WellPoint last year, particularly related to the Axia suite of services I assume. And I was just curious if you could give us an update on how that is going? I had some sense that you probably had some sell-in that might have to go through some of their respective plans around the United States. Just any comments you can give us about the WellPoint relationship would be quite helpful.

A:      (B. Leedle): ***We have been excited and thrilled with the WellPoint relationship as we have talked about it. When we signed that agreement, we knew that it would be expansion off of business that had already been established as a business that Axia had started. We expanded last winter. We said that it was a significant agreement that would obviously take time to phase in because some of***

*the products and services were a function of fully insured book to business which would happen sooner, and even some of that business would not happen until into '08. And a good portion of this obviously is aimed at their ASO population, which is no different than any other hunting license type relationship that we might have with a health plan.*

*So we're very pleased with the progress that we have made over the last year, and we're excited about the work that is coming forward for us as a result of that relationship in '08.*

136. Upon this news, shares of the Company's stock rose $4.48 per share, or 8%, to close at $60.00 per share, on heavy trading volume.

137. On January 7, 2008, the Company filed a Form 8-K with the SEC announcing that the "*Office of Management and Budget has approved a request from the Centers for Medicare and Medicaid Services ("CMS") to lower the savings target for the Medicare Health Support ("MHS") Program from 5% net savings to budget neutrality (savings greater than or equal to fees).*"

138. On January 7, 2008, in an article entitled *Healthways shares reach record high on rate reduction in Medicare pilot program*, the *Associated Press* reported that shares of Healthways rose as a result of the analyst upgrade. The press release continued, in pertinent part:

Shares of Healthways Inc. reached a record high Monday after Medicare lowered a key rate affecting disease-management-program administrators, **with one analyst suggesting the change may add as much as 25 cents per share to the company's fiscal 2008 earnings**.

The stock hit a record $65.24 in afternoon trading, and closed up $6.03, or 10.3 percent, at $64.50 Monday. The company focuses on providing preventive health services, including fitness, alternative medicine and smoking cessation programs.

In a filing with the Securities and Exchange Commission Monday, Healthways said the Office of Management and Budget approved a request from the Centers for Medicare and Medicaid Services (CMS) to lower the savings target rate for the Medicare Health Support program (MHS) from 5 percent net savings to break-even.

The rate was a cost savings benchmark which disease management companies had to achieve for their clients under the program, and a financial burden to Healthways and its peers. The rate change means savings now achieved under the program only have to cover Healthways' management fees.

In the filing, Healthways declined to adjust its fiscal 2008 financial guidance, since no timeline for implementing the new rate was disclosed. ***But Banc of America***

*Securities analyst Michael Yuan said the rate change could mean as much as 25 cents per share more profit for the company in fiscal 2008.*

In a note to clients, he said the change will likely drive a national rollout of the pilot MHS program, boosting the population from a potential 160,000 seniors to 14 million with an annual revenue opportunity of $7 billion to $20 billion, up dramatically from $20 million presently. The first phase of the program, launched in 2005, encompasses eight regions and measures performance across about 20,000 seniors with heart conditions and diabetes. The control group, or healthy group, involves 10,000 people.

The savings target rate was one reason LifeMasters, Cigna Corp. and McKesson Corp. quit the program, leaving just Healthways, Aetna Inc., Humana Inc., and two private vendors left. Currently no vendor is achieving the savings rate, causing some to wonder if the disappointing results would drive CMS to quit the program. *But Yuan said the rate change will likely diffuse those concerns.*

Yuan reaffirmed a "Buy" rating on Healthways. The stock is trading above his 12-month price target of $60.

139.    As a result shares of the Company's stock rose $8.74 per share, or approximately 15%, to close at $67.21 per share, over the next two trading days.

140.    On January 8, 2008, the Company filed its Form 10-Q with the SEC reporting financial results for its first quarter of fiscal 2008.

141.    The statements referenced above in ¶¶131-40 were materially false and/or misleading when made because they misrepresented and failed to disclose that:

(a)    Healthways was not meeting even the modified break-even savings target sought from and ultimately set by CMS. As a result of Healthways' failure, CMS would likely not expand the MHS program to a second phase and the Company could be required to reimburse CMS for millions of dollars in fees they had already received through the program;

(b)    Healthways was losing contracts, being required to provide additional services for the same price, rebating fees, and was experiencing slower enrollment in existing contracts due to a decline in the need for the Company's services;

(c)     Healthways' customers including Blue Cross of Minnesota, Blue Cross of Massachusetts and Wellmark, were renegotiating contracts making them less profitable to the Company;

(d)     Healthways was experiencing large numbers of customer terminations of its failing Health Support programs which were wrought with quality problems;

(e)     as a result of the foregoing, as well as the inclusion of approximately $40 million in revenues from WellPoint which defendants knew would not be earned during fiscal 2008, defendants had no reasonable basis to believe and did not in fact believe the revenue and earnings guidance of $782 million to $815 million and $1.77 to $1.86, respectively, they provided for fiscal 2008; and

(f)     as a result of the foregoing, Healthways would experience declining revenue growth for the first half of fiscal 2009.

142.    Defendants failure to disclose the above material information in the MD&A Section of the Company's fiscal 2007 Form 10-K, its 3Q07 Form 10-Q, and its 1Q08 Form 10-Q violated SAB 99, SOP 94-6 and the duty to disclose or abstain from trading.

## The Truth in Part Begins to be Disclosed

143.    On January 29, 2008, CMS announced to the market for the first time that its preliminary evaluations of the MHS program indicate that Phase I of the program is not meeting the statutory requirements.  The CMS will determine whether to expand the pilot into Phase II if the results of the independent evaluation indicate that any of the programs (or program components) meet the conditions for expansion as specified in statute.

144.    MHS further announced its preliminary Phase I findings stating:

However, to achieve budget neutrality, the five MHSOs in current operation need to reduce Medicare claims costs by between $300 and $800 per participant per month for the remaining months of the pilot program.  This represents a 20 to 40 percent reduction in claims costs from the current levels that are being billed.  Program-wide

fees paid to the MHSOs to date total approximately $360 million – an increase of 5 to 11 percent in Medicare costs for participating beneficiaries. Total operational costs to date to CMS are estimated at approximately $27 million.

145.     On January 30, 2008, the *Associated Press* reported that the "Centers for Medicare & Medicaid Services (CMS) said the first phase of a pilot wellness program will end this year, as scheduled, but didn't indicate whether a Phase II expansion is in the cards."

146.     On January 30, 2008, according to an analyst for Credit Suisse:

CMS released estimates that suggests the MHSOs (Medicare Health Support organizations) need to recognize cost savings of between $300 (20% reduction in medical costs) and $800 (40% reduction in medical costs) per participant each month for the remainder of the pilots. This is to make up for the "start-up" costs and fees collected (ranging from $74-$159 per participant per month). This hurdle of 20-40% cost saving for the remainder of the pilot sounds nearly insurmountable to us . . . .

147.     The Credit Suisse analyst concluded that CMS' recent revelation regarding the participants' inability to meet even the reduced "break-even" target "***will likely come as a major surprise for shareholders who responded so favorably to the budget neutrality announcement at the beginning of January***." On January 29, 2008, William Blair & Company similarly described CMS's announcement regarding the participants' "overall savings status (or, better said, lack thereof)" as "***novel information***."

148.     Analysts also pointed out that, in light of CMS' recent announcement, "a Phase II expansion seems unlikely to happen until well into 2010 if at all."

149.     As a result, shares of the Company's stock fell $10.52 per share, or 16%, to close at $55.85 per share, on heavy trading volume. However, Healthways' share price continued to be inflated as this statement failed to disclose: (a) any information regarding the problems with Healthways' core business as described above; or (b) that the guidance for fiscal 2008, which had been previously publicly disseminated was unachievable.

150.     On February 12, 2008, in an article entitled *Minnesota Chill For Healthways*, Forbes.com reported, in pertinent part, as follows:

Healthways was hurting Tuesday.

Shares of the provider of corporate wellness and other health-related educational and support services tumbled 9.6% on investor concerns over a potential contract cancellation by Blue Cross Blue Shield of Minnesota.

Healthways management reportedly told analysts that at a recent working group session, representatives of Blue Cross Blue Shield of Minnesota said they were contemplating bringing disease management services in-house. No formal contract termination has been sent to Healthways though.

Jefferies analysts Arthur I. Henderson said that even though a loss of the contract may be a risk for the company, it had been a declining contract, accounting for 3% of Healthways' sales in 2007 compared with 10% in 2005.

The contract began losing value when Minnesota's former state attorney general, Mike Hatch, publicly faulted Blue Cross for excessive spending, Henderson said. One of the ways Blue Cross cut costs was to move to an "opt in" versus "opt out" model, where patients only received Healthways' services if they opted in. This led to declining revenues over the last several years.

Henderson said that he believes a loss of the contract could cut annual earnings by 8 cents, partially in 2009 and fully in 2010. Henderson said that Healthways may be able to recapture some of those lost earnings by contracting directly with the health plan's employer customer base. He said 65% of Blue Cross's sales comes from self-insured employers who may contract with Healthways directly.

Tuesday's news comes after the Centers for Medicare and Medicaid Services announced at the end of last month that Healthways did not meet some statutory requirements of Phase 1 of its Medicare Health Support program, which will end this year. This means the healthcare provider may not be able to continue to Phase 2, which was supposed to start in late 2009.

The requirements include improvement in clinical quality and beneficiary satisfaction, and achievement of savings targets.

Henderson said there were inherent flaws in this pilot program and that disease management is a viable sector with good growth prospects. "To continue ahead on Phase 2 with the structure that was in place would have been irresponsible for the company in terms of shareholder value," he said.

Phase 1, Henderson said, cost the company $1 a share in missed earnings.

Healthways is one of the five Medicare Health Support Organizations currently active in the program and has two MHS pilots in Maryland and District of Columbia.

In July, Healthways Chief Executive Officer Ben R. Leedle Jr. said that the company was sticking with the Medicare pilot program even though it wasn't producing any revenue and actually cost the company money.

But Leedle said the long-term benefits of establishing a strong position in the growing market outweigh the downside.

The company announced it slashed its fiscal year 2007 guidance to $1.21 to $1.22 a share, down from $1.44 to $1.61 a share, because of the Medicare program.

Healthways shares fell $4.95 Tuesday to close at $46.64.

151.     On February 13, 2008, the Company issued a press release in reaction to the CMS's Conclusions with Regard to Company's MHS Phase I Pilot.  In that regard, the press release stated, in pertinent part:

> "The purpose of our communication with Acting Administrator Weems," Leedle stated, "was to affirmatively remind CMS that performance in MHS must be evaluated at the individual pilot, or pilot component level, not in the aggregate. Further, we continue to have a number of unresolved issues related to the design, beneficiary selection, randomization and other aspects of the Phase I pilots, including the fact that CMS did not deliver the pilot population that it was contractually obligated to provide. While ultimate resolution of these issues will impact the final results of our pilot, we believe, based on our analysis of the data that has been provided to us, our program or its components will meet or exceed the statutory and current Cooperative Agreement targets by which MHS performance is to be evaluated. This level of performance is not surprising to us given that every metric we use to evaluate the operational execution of our programs is exceeding the targets we set specifically for MHS."

> Healthways letter to Weems also addressed any Beneficiary confusion or concern that CMS' announcements may have caused by informing CMS that, "Until the planned completion in July of the Phase I pilot program, we (the Company) will continue to pursue the objectives outlined in the statute and Cooperative Agreement for the nearly 16,000 program participants for whom we are making a profound, meaningful and important difference in their lives."

152.     Then, on February 26, 2008, the Company issued a press release announcing that it was lowering its financial guidance for fiscal 2008.  The Company lowered its revenue guidance from a range of $782 million to $815 million to a range of $720 million to $740 million.  Moreover, the Company lowered its earnings guidance from a range of $1.77 to $1.86 per share to a range of $1.50 to $1.55 per share.  Defendant Leedle, commenting on the revised guidance, stated, in pertinent part:

> ***We are revising our fiscal 2008 guidance at this time primarily due to slower-than-projected enrollment in a new Health Support program with one large health plan***

**customer and the recent indication that two previously anticipated contracts will not materialize during this fiscal year**.

Health Support enrollment: One large health plan customer was unable to provide timely access for member sign-up to reach projected enrollment into our new program. Both we and the customer believe the resulting lower enrollment rate is primarily a timing issue. We are working together to expedite the enrollment of eligible members into this Health Support program.

Two unrealized opportunities: We were disappointed to learn from one large, long-term health plan customer - who had already expanded with two additional programs from Healthways this year - that they were unable to purchase an anticipated third program due to budget constraints. Simultaneously, we were informed that a different health plan customer had decided to extend their current agreement for another year with their existing provider of Complementary and Alternative Medicine (CAM)/Chiropractic network services.

153.    With regard to its financial guidance, the press release stated, in pertinent part, as follows:

Revenue

Healthways today revised its guidance for fiscal 2008 revenues to a range of $720 million to $740 million, an increase of 17% to 20% from fiscal 2007, as compared with its previous guidance in a range of $782 million to $815 million.

Earnings

The Company's revised guidance for fiscal 2008 earnings per diluted share is in the **range of $1.50 to $1.55**, an increase of 23% to 27% from fiscal 2007. **This guidance includes a now expected net cost impact of the MHS pilots of approximately $0.22 per diluted share**, as well as the previously expected net cost impact of the Company's move to its new headquarters and of the Company's international business.

154.    Upon this news, shares of the Company's stock fell $13.42 per share, or approximately 30%, to close at $31.93 per share, on heavy trading volume. However, Healthways' shares continued to trade at inflated prices until August 25, 2008, when the defendants belatedly disclosed the impact of its renegotiation of certain contracts and the revenue reduction associated with certain contract terminations, including the Blue Cross of Minnesota contract, which defendants had concealed from investors during the Class Period. Defendants were well aware that this would adversely impact Healthways 2008 and 2009 revenues, and ensure that Healthways could not

possibly post revenue growth, but in fact would suffer *revenue declines* for the first half of 2009 as a result thereof.

155.    On March 18, 2008, Healthways issued a press release announcing its financials results for the second quarter of fiscal 2008, ended February 29, 2008.  The press release stated as follows:

> **NASHVILLE, Tenn. (March 18, 2008)** – Ben R. Leedle, Jr., president and chief executive officer of Healthways, Inc. (NASDAQ: HWAY), today announced financial results for the second quarter of fiscal 2008, ended February 29, 2008. Total revenues for the quarter increased to $179.0 million, up 12% from $160.3 million for the second quarter of fiscal 2007.  Net income for the second quarter of fiscal 2008 increased 13% to $12.5 million from $11.0 million for the second quarter of the last fiscal year.  Net income per diluted share for the latest quarter was $0.33, up 10% from $0.30 for the second quarter of fiscal 2007.

> Mr. Leedle said, "As anticipated, our earnings per diluted share for the second quarter were consistent with the guidance we established in our first-quarter earnings release.  Our domestic results reflected the impact of a significant number of contracts that began operations on January 1st, which we expect will contribute more substantially to our revenue growth in the second half of the fiscal year.  In addition to the costs associated with the start-up of these contracts, these results included costs related to the opening of three domestic call centers in the first half of fiscal 2008, continued integration work from the Axia transaction and participation in our Medicare Health Support pilots."

156.    With regard to the Company's financial guidance, the press release stated, in pertinent part:

> Revenue

> Healthways today affirms its guidance for fiscal 2008 revenues in a range of $720 million to $740 million, an increase of 17% to 20% from fiscal 2007.  This guidance includes Healthways' first revenues related to the contract in Germany with Deutsche Angestellten Krankenkasse (DAK) in a range of $8 million to $10 million. Healthways does not expect the signing of its second international contract, with Fleury, S.A. in Brazil, to have a material impact on fiscal 2008 results.

> *          *          *

> Earnings

> The Company today also affirmed its guidance for fiscal 2008 earnings per diluted share in the range of $1.50 to $1.55, an increase of 23% to 27% from fiscal 2007. This guidance includes an expected net cost impact of the Medicare Health Support

pilots of approximately $0.22 per diluted share, as well as the previously expected net cost impact of the Company's move to its new headquarters and of the Company's international business.

157.    On April 8, 2008, Healthways filed its second quarter 2008 Form 10-Q with the SEC, which disclosed a decrease in revenues for the three months and six months ended February 29, 2008, compared to February 28, 2007, "primarily due to contract terminations and reductions in the scope of our services with certain customers."

158.    On June 18, 2008, Healthways issued a press release announcing its financial results for the third quarter of fiscal 2008, ended May 31, 2008. The press release stated as follows:

> **NASHVILLE, Tenn. (June 18, 2008)** – Ben R. Leedle, Jr., president and chief executive officer of Healthways, Inc. (NASDAQ: HWAY), today announced financial results for the third quarter of fiscal 2008, ended May 31, 2008. Total revenues for the quarter were $191.4 million, a 14% increase from $167.9 million for the third quarter of fiscal 2007. Net income rose 30% to $14.0 million from $10.8 million. Net income per diluted share increased 34% to $0.39 for the third quarter of fiscal 2008 from $0.29 for the third quarter of fiscal 2007.

159.    On August 25, 2008 the Company issued a press release with financial guidance for the three months ending November 30, 2008. The press release stated:

> Fiscal 2008 Guidance
>
> Healthways today affirms its previously issued guidance for fiscal 2008 revenues in a range of $720 million to $740 million, which would represent an increase of 17% to 20% from fiscal 2007. The Company today also affirms its previously issued guidance for fiscal 2008 earnings per diluted share in the range of $1.50 to $1.55, which would represent an increase of 23% to 27% from fiscal 2007.
>
> Earnings Guidance for the Three Months Ending November 30, 2008
>
> Healthways today establishes its guidance for earnings per diluted share for the three months ending November 30, 2008, in a range of $0.34 to $0.37, which would represent an increase of 13% to 23% from the three months ended November 30, 2007. Mr. Leedle added, "While this guidance anticipates solid earnings growth from the comparable prior-year period, the sequential-quarter performance reflects a decline in revenue due to the impact of certain contract renegotiations, reduced revenues associated with the winding down of a previously discussed contract terminating at the end of calendar 2008 and the full-quarter effect of small contract losses due to health plan consolidation. This earnings guidance also anticipates incremental costs associated with the implementation of contracts scheduled to begin on January 1st."

160.    Upon this news, shares of the Company's stock fell $5.54 per share, or approximately 22%, to close at $19.73 per share.

161.    The markets for Healthways common stock were open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Healthways' securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Healthways common stock relying upon the integrity of the market price of Healthways common stock and market information relating to Healthways, and have been damaged thereby.

162.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Healthways common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

163.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Healthways' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Healthways and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class

purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

164. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Healthways, their control over, and/or receipt and/or modification of Healthways' allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Healthways, participated in the fraudulent scheme alleged herein.

165. Defendants were further motivated to engage in this course of conduct in order to allow defendants and other Company insiders to collectively sell 519,574 shares of their personally-held Healthways common stock for gross proceeds in excess of $28.2 million. Cigarran's sale of 75,000 shares during the Class Period was out of line with past trading practices as Cigarran had not sold any Healthways' shares for nearly two years prior to his Class Period sales, and like the other insiders' Class Period sales, were calculated to maximize personal benefit as they were sold at inflated prices before adverse material facts were disclosed to the market. Similarly, Donald Taylor's, Matthew E. Kelliher's and L. Ben Lytle's Class Period sales, which are detailed below, were also out of line with past trading practices as these individuals had not sold any Healthways' shares between January 1, 2005 and the start of the Class Period and like the other insiders' Class Period sales, were calculated to maximize personal benefit as they were sold at inflated prices before

adverse material facts were disclosed to the market. The insider shares sold during the Class Period are set forth more fully in the following chart:

| Name | Date | Shares Sold During Class Period | Price | Proceeds | Stock Holdings As Of Last Class Period Sale | % Sold |
|---|---|---|---|---|---|---|
| THOMAS CIGARRAN | 11/5/2007 | 20,123 | $57.55 | $1,158,079 | | |
| | 11/6/2007 | 54,877 | $57.98 | $3,181,768 | | |
| | | 75,000 | | $4,339,847 | 324,820 | 18.76% |
| HENRY HERR | | | | | | |
| | 10/29/2007 | 67,900 | $57.55 | $3,907,645 | | |
| | 10/29/2007 | 28,464 | $57.55 | $1,638,103 | | |
| | 10/29/2007 | 1,460 | $57.55 | $84,023 | | |
| | | 97,824 | | $5,629,771 | 291,644 | 25.12% |
| MARY HUNTER | | | | | | |
| | 1/7/2008 | 50,000 | $62.00 | $3,100,000 | | |
| | | 50,000 | | $3,100,000 | 3,780 | 92.97% |
| MATTHEW KELLIHER | | | | | | |
| | 11/1/2007 | 17,348 | $59.73 | $1,036,196 | | |
| | 11/2/2007 | 22,652 | $58.24 | $1,319,252 | | |
| | | 40,000 | | $2,355,449 | 222 | 99.45% |
| ALFRED LUMSDAINE | | | | | | |
| | 7/16/2007 | 3,250 | $47.91 | $155,708 | | |
| | 10/31/2007 | 2,000 | $60.20 | $120,400 | | |
| | | 5,250 | | $276,108 | 1,608 | 76.55% |
| L. BEN LYTLE | | | | | | |
| | 1/9/2008 | 24,000 | $67.52 | $1,620,480 | | |
| | | 24,000 | | $1,620,480 | 97,544 | 19.75% |
| DONALD TAYLOR | | | | | | |
| | 7/16/2007 | 100,000 | $47.96 | $4,796,000 | | |
| | 7/16/2007 | 77,500 | $47.97 | $3,717,675 | | |
| | 7/16/2007 | 50,000 | $47.95 | $2,397,500 | | |
| | | 227,500 | | $10,911,175 | 362 | 99.84% |
| | Total: | 519,574 | | $28,232,829 | | |

## Loss Causation/Economic Loss

166. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Healthways common stock and operated as a fraud or deceit on Class Period purchasers of Healthways common stock by misrepresenting and failing to disclose that:

(a)    Healthways was not meeting even the modified break-even savings target sought from and ultimately set by CMS. As a result of Healthways' failure, CMS would likely not

expand the MHS program to a second phase and the Company could be required to reimburse CMS for millions of dollars in fees they had already received through the program;

(b)     Healthways was losing contracts, being required to provide additional services for the same price, rebating fees, and was experiencing slower enrollment in existing contracts due to a decline in the need for the Company's services;

(c)     Healthways' customers were renegotiating contracts making them less profitable to the Company;

(d)     Healthways was experiencing large numbers of customer terminations of its failing Health Support programs which were wrought with quality problems; and

(e)     as a result of the foregoing, the defendants had no reasonable basis for the revenue and earnings guidance they provided for fiscal 2008.

167.    When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Healthways common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Healthways common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

168.    By failing to disclose the above facts, defendants presented a misleading picture of Healthways' business and prospects.  Defendants' false and misleading statements had the intended effect and caused Healthways common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $69.34 per share on January 10, 2008.

169.    As a direct result of disclosures on January 30, 2008, February 12, 2008 and February 26, 2008, the price of Healthways common stock fell precipitously, falling by more than a collective $28 per share, or approximately 55%.  As a direct result of the disclosure occurring on August 25, 2008 the price of Healthways common stock fell more than $5 per share or approximately 22%.

These disclosures removed the inflation from the price of Healthways common stock, causing real economic loss to investors who had purchased Healthways common stock during the Class Period.

170.    The precipitous decline in the price of Healthways common stock after these disclosures came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Healthways common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Healthways common stock and the subsequent significant decline in the value of Healthways common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

171.    At all relevant times, the market for Healthways common stock was an efficient market for the following reasons, among others:

(a)    Healthways common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Healthways filed periodic public reports with the SEC and the NASDAQ;

(c)    Healthways regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Healthways was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

172.    As a result of the foregoing, the market for Healthways common stock promptly digested current information regarding Healthways from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Healthways common stock during the Class Period suffered similar injury through their purchase of Healthways common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

173.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Healthways who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

174.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

175.     During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

177.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Healthways common stock.  Plaintiffs and the Class would not have purchased Healthways common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

178.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Healthways common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

179. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

180. The Individual Defendants acted as controlling persons of Healthways within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Healthways, and their ownership of Healthways stock, the Individual Defendants had the power and authority to cause Healthways to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## COUNT III

### Insider Trading Under §20A of the Exchange Act
### Against Defendants Cigarran, Taylor, Hunter and Kelliher

181. Plaintiffs repeat and re-alleges each of the allegations set forth in the foregoing paragraphs.

182. This claim is asserted by Plaintiffs under §20A of the Exchange Act against Defendants Cigarran, Taylor, Hunter and Kelliher, on behalf of all persons who purchased Healthways common stock contemporaneously with the sale of Healthways common stock by these Individual Defendants.

183. During the Class Period, each of the Individual Defendants occupied a position with Healthways that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business prospects. Individual Defendants' public representations on these subjects set forth herein were materially false and misleading.

184. Notwithstanding their duty to refrain from trading in Healthways common stock unless they disclosed the foregoing material adverse facts, and in violation of their fiduciary duties to

Plaintiffs and other members of the Class, Defendants Cigarran, Taylor, Hunter and Kelliher sold in the aggregate millions of dollars worth of Healthways common stock during the Class Period contemporaneously with Class members' purchases of Healthways common stock. Specifically, the following trades violated §20A of the Exchange Act:

| Date of Trade | Defendant |
|---|---|
| July 16, 2007 | Taylor |
| November 1, 2007 | Kelliher |
| November 2, 2007 | Kelliher |
| November 5, 2007 | Cigarran |
| November 6, 2007 | Cigarran |
| January 7, 2008 | Hunter |

185. Defendants Cigarran, Taylor, Hunter and Kelliher sold their shares of Healthways common stock, as alleged above, at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period.

186. Each sale identified in ¶184 occurred contemporaneously with Healthways common stock purchases by at least one or more of the members of the Class.

187. Defendants Cigarran, Taylor, Hunter and Kelliher knew that they were in possession of material adverse information which was not known to the investing public, including Plaintiffs and other members of the Class. Before selling their stock to the public, they were obligated to disclose that information to Plaintiffs and other members of the Class.

188. By reason of the foregoing, Defendants Cigarran, Taylor, Hunter and Kelliher, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased Healthways common stock contemporaneously with the sale of such stock by Defendants Cigarran, Taylor, Hunter and Kelliher.

189.     Lead Plaintiff and other members of the Class who purchased shares of Healthways common stock contemporaneously with the Defendants Cigarran, Taylor, Hunter and Kelliher sales of Healthways common stock: (a) have suffered substantial damages because they relied upon the integrity of the market and paid artificially inflated prices for Healthways common stock as a result of the violations of §10(b) and Rule 10b-5 alleged herein; and (b) would not have purchased Healthways common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and concealment.  At the time of the purchases by Lead Plaintiff and members of the Class, the fair and true value of Healthways common stock was substantially less than the prices paid by them.

190.     This action was commenced within five years after the sales by Defendants Cigarran, Taylor, Hunter and Kelliher while in possession of material, non-public information.

191.     As a result of the foregoing, Plaintiffs and the other members of the Class have suffered substantial damages.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: September 22, 2008

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue North
Nashville TN 37201
Telephone: 615-244-2202
615-252-3798 (fax)
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

Liaison Counsel

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
SCOTT H. SAHAM
JESSICA T. SHINNEFIELD
JENNIFER Y. LAI


                    s/ Darren J. Robbins
_____
              DARREN J. ROBBINS

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
scotts@csgrr.com
jshinnefield@csgrr.com
jlai@csgrr.com

Lead Counsel for Plaintiffs

DYER & BERENS LLP
JEFFREY A. BERENS
ROBERT J. DYER III
682 Grant Street
Denver, Colorado 80203
Telephone: (303) 861-1764
(303) 395-0393 (fax)
jeff@dyerberens.com
bob@dyerberens.com

HOLZER, HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL DEES
1117 Perimeter Center West, Suite E-107
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mfistel@holzerlaw.com
mdees@holzerlaw.com

Additional Counsel for Plaintiffs

S:\CasesSD\Healthways\CPT00054119.doc

<u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that on this the 22nd day of September, the foregoing CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

**Ramzi Abadou**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
ramzia@csgrr.com,hectorm@csgrr.com,e_file_sd@csgrr.com

**George Edward Barrett**
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
gbarrett@barrettjohnston.com

**Jeffrey A. Berens**
Dyer & Berens LLP
682 Grant Street
Denver, CO 80203-1764
303/861-1764
303/395-0393(Fax)
jeff@dyerberens.com

**Paul Kent Bramlett**
Bramlett Law Offices
P.O. Box 150734
Nashville, TN 37215-0734
615/248-2828
615/254-4116(Fax)
pknashlaw@aol.com

**Robert P. Bramlett**
Bramlett Law Offices
P.O. Box 150734
Nashville, TN 37215-0734
615/248-2828
615/254-4116(Fax)
robert@bramlettlawoffices.com

**Marshall Dees**
Holzer Holzer & Fistel, LLC
1117 Perimeter Center West, Suite E-107
Atlanta, GA 30338
770/392-0090
770/392-0029(Fax)
mdees@holzerlaw.com

**Wallace Wordsworth Dietz**
Bass, Berry & Sims, PLC
315 Deaderick Street, Suite 2700
Nashville, TN 37238-2700
615/742-6200
615/742-6293(Fax)
wdietz@bassberry.com

**Robert J. Dyer , III**
Dyer & Berens LLP
682 Grant Street
Denver, CO 80203-1764
303/861-1764
303/395-0393(Fax)
bob@dyerberens.com

**Michael I. Fistel , Jr.**
Holzer Holzer & Fistel, LLC
1117 Perimeter Center West, Suite E-107
Atlanta, GA 30338
770/392-0090
770/392-0029(Fax)
mfistel@holzerlaw.com

**Corey D. Holzer**
Holzer Holzer & Fistel, LLC
1117 Perimeter Center West, Suite E-107
Atlanta, GA 30338
770/392-0090
770/392-0029(Fax)
cholzer@holzerlaw.com

**Susan E. Hurd**
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
susan.hurd@alston.com

**Douglas S. Johnston , Jr.**
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
djohnston@barrettjohnston.com

**D. Seamus Kaskela**
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
610/667-7706
610/667-7056(Fax)
skaskela@sbtklaw.com

**Jennifer Yeu-Jeng Lai**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
jlai@csgrr.com

**John L. Latham**
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
john.latham@alston.com

**Timothy L. Miles**
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
tmiles@barrettjohnston.com

**David M. Promisloff**
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
610/667-7706
610/667-7056(Fax)
dpromisloff@sbtklaw.com

**Brian D. Roark**
Bass, Berry & Sims, PLC
315 Deaderick Street, Suite 2700
Nashville, TN 37238-2700
615/742-6200
615/742-6293(Fax)
broark@bassberry.com,virwin@bassberry.com,lmccampbell@bassberry.com,
shurd@alston.com,john.latham@alston.com

**Darren J. Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@csgrr.com

**Samuel H. Rudman**
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@csgrr.com

**Scott H. Saham**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
scotts@csgrr.com

**Jessica Shinnefield**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
jshinnefield@csgrr.com

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on September 22, 2008.

s/ Darren J. Robbins
DARREN J. ROBBINS

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: darrenr@csgrr.com